## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AVADEL CNS PHARMACEUTICALS, LLC, <br><br> *Plaintiff*, <br><br> v. <br><br> XAVIER BECERRA, Secretary of Health and Human Services, <br><br> U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> ROBERT M. CALIFF, Commissioner of Food and Drugs, <br><br> U.S. FOOD AND DRUG ADMINISTRATION, <br><br> *Defendants,* <br><br> & <br><br> JAZZ PHARMACEUTICALS, INC., <br><br> *Defendant-Intervenor*. | Case No. 1:22-cv-2159-APM |

**DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Defendant-Intervenor Jazz Pharmaceuticals, Inc. ("Jazz") hereby cross-moves for entry of summary judgment against Avadel CNS Pharmaceuticals, LLC ("Avadel") and in favor of the Defendants.

First, Avadel cannot establish subject matter jurisdiction because section 505(h) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 355(h), vests exclusive review in the courts of appeals.

Second, Avadel lacks a cause of action under the Administrative Procedure Act, both because the agency has not taken final action and because Avadel has adequate remedies in the court of appeals under section 505(h) and in pending patent litigation in the District Court for the District of Delaware.

Third, Avadel failed to demonstrate that FDA violated the Administrative Procedure Act; the administrative record confirms that FDA acted reasonably and in a manner consistent with its authority under law.

In addition to awarding summary judgment in favor of the Defendants, Jazz requests that the Court deny Avadel's motion for a preliminary injunction because Avadel has neither demonstrated a likelihood of success on the merits nor established that any of the other traditional equity factors supports the award of extraordinary relief. *See* ECF No. 2.

The grounds for Jazz's cross-motion for summary judgment and its opposition to Avadel's motion for summary judgment and a preliminary injunction are set forth more fully in the accompanying memorandum of points and authorities. A proposed order is attached.

Dated: August 19, 2022

Respectfully submitted,

/s/ Kwaku A. Akowuah
Kwaku A. Akowuah (D.C. Bar No. 992575)
Sean C. Griffin (D.C. Bar No. 499537)
Christopher S. Ross (D.C. Bar No. 1643856)
SIDLEY AUSTIN LLP
1501 K Street N.W.
Washington, DC 20005
T: (202) 736-8000
F: (202) 736-8711
kakowuah@sidley.com
sgriffin@sidley.com
christopher.ross@sidley.com

*Counsel for Defendant-Intervenor Jazz Pharmaceuticals Inc.*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AVADEL CNS PHARMACEUTICALS, LLC,<br><br>   *Plaintiff*,<br><br> v.<br><br>XAVIER BECERRA, Secretary of Health and Human Services,<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>ROBERT M. CALIFF, Commissioner of Food and Drugs,<br><br>U.S. FOOD AND DRUG ADMINISTRATION,<br><br>   *Defendants,*<br><br>  &<br><br>JAZZ PHARMACEUTICALS, INC.,<br><br>   *Defendant-Intervenor*. | Case No. 1:22-cv-2159-APM<br><br>__REDACTED__ |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT-INTERVENOR'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION ........................................................................................... 1

BACKGROUND .............................................................................................. 3

I.   FACTUAL BACKGROUND ..................................................................... 3

    A.   FDA-Approved Treatments For Narcolepsy ............................................ 3

    B.   Jazz's REMS And The '963 Patent ....................................................... 5

    C.   Avadel's Gamble On FT218 And Refusal To Certify To The '963 Patent ........... 7

II.  PROCEDURAL BACKGROUND ................................................................ 8

    A.   FDA's Review Of Avadel's Application .................................................. 8

    B.   FDA's Rejection Of Avadel's Section 505(b)(2)(B) Statement ...................... 9

    C.   Avadel's Decision To Submit A Patent Certification .................................. 10

    D.   Ongoing Patent Litigation Between Jazz And Avadel .................................. 11

    E.   Unresolved Orphan Drug Exclusivity Questions ....................................... 12

ARGUMENT .................................................................................................. 12

I.   THE COURT SHOULD ENTER JUDGMENT AGAINST AVADEL ....................... 13

    A.   Section 505(h) of the Food Drug and Cosmetic Act Removes This Court's
         Jurisdiction To Address Avadel's Claims .............................................. 13

    B.   Avadel Has No Cause of Action under the APA. ........................................ 15

        1.   The Patent Decision Is Not Final Agency Action. ............................... 15

        2.   Avadel Has Other Adequate Remedies. ............................................ 17

    C.   Avadel Has Not Established A Legal Violation. ........................................ 18

        1.   FDA Had Authority To Review Avadel's Statement. ............................. 18

            a.   Avadel Waived Its Challenge To FDA's Authority. ..................... 18

            b.   FDA Was Required To Review Avadel's Statement. .................... 19

c. The Opinion Clause Does Not Require FDA To Accept Untrue Statements. ......................................................... 22

d. Avadel's Position Would Yield Absurd Results. .......................... 25

2. The '963 Patent and Use Code 1110 Are Appropriately Included In The *Orange Book* And Cannot Be Challenged Here. .............................. 26

a. The '963 Patent Is Appropriately Listed. ...................................... 27

b. Use Code 1110 Is Appropriate. ..................................................... 30

c. Avadel Cannot Challenge *Orange Book* Listings Here. ............... 31

3. FDA Properly Reviewed Avadel's Proposed REMS To Assess The Accuracy Of Avadel's Statement. ................................................ 32

4. FDA Reasonably Determined That Avadel's Proposed REMS Would Tread On The Use Code. ............................................... 38

5. FDA Did Not Unlawfully Withhold or Unreasonably Delay Any Action Owed To Avadel. .......................................................... 40

II. AVADEL HAS NOT DEMONSTRATED A BASIS FOR INJUNCTIVE RELIEF. ............................................................................................... 43

CONCLUSION ........................................................................................................ 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*aaiPharma Inc. v. Thompson*,
    296 F.3d 227 (4th Cir. 2002) ...........................................................................25, 26

*Abbott Lab'ys v. Young*,
    920 F.2d 984 (D.C. Cir. 1990) .................................................................................25

*Air Line Pilots Ass'n, Int'l v. Civ. Aeronautics Bd.*,
    750 F.2d 81 (D.C. Cir. 1984) ...................................................................................13

*Alphapharm Pty Ltd. v. Thompson*,
    330 F. Supp. 2d 1 (D.D.C. 2004) .............................................................................26

*\*Apotex, Inc. v. Thompson*,
    347 F.3d 1335 (Fed. Cir. 2003)..........................................................................26, 31

*Athenex Inc. v. Azar*,
    397 F. Supp. 3d 56 (D.D.C. 2019) .....................................................................12, 13

*\*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
    512 F.3d 1338 (Fed. Cir. 2008)..........................................................................38, 39

*\*Bennett v. Spear*,
    520 U.S. 154 (1997)............................................................................................15, 17

*\*Blanton v. Off. of the Comptroller of Currency*,
    909 F.3d 1162 (D.C. Cir. 2018)..........................................................................22, 24

*BNSF v. STB*,
    453 F.3d 473 (D.C. Cir. 2006) .................................................................................19

*Cal. Cmtys. Against Toxics v. EPA*,
    934 F.3d 627 (D.C. Cir. 2019) ...........................................................................15, 16

*Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*,
    566 U.S. 399 (2012)..................................................................................................21

*Citizens for Resp. & Ethics in Washington v. FEC*,
    971 F.3d 340 (D.C. Cir. 2020) .................................................................................38

*City of Salisbury v. FERC*,
    36 F.4th 1164 (D.C. Cir. 2022) ................................................................................24

*\*ConverDyn v. Moniz*,
    68 F. Supp. 3d 34 (D.D.C. 2014) .............................................................................43

*Cutler v. Hayes*,
    818 F.2d 879 (D.C. Cir. 1987) .................................................................................20

*Authorities chiefly relied upon are marked with asterisks.

*Davis v. Pension Benefit Guar. Corp.*,
   571 F.3d 1288 (D.C. Cir. 2009) .............................................................................43

*El Rio Santa Cruz Neighborhood Health Ctr. v. HHS*,
   396 F.3d 1265 (D.C. Cir. 2005) .............................................................................17

*Epic Sys. Corp. v. Lewis*,
   138 S. Ct. 1612 (2018) ...........................................................................................26

*\*Fritch v. U.S. Dep't of State*,
   220 F. Supp. 3d 51 (D.D.C. 2016) ...................................................................18, 19

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
   460 F.3d 13 (D.C. Cir. 2006) .................................................................................15

*Gallardo ex rel. Vassallo v. Marstiller*,
   142 S. Ct. 1751 (2022) ...........................................................................................20

*Garcia v. Vilsack*,
   563 F.3d 519 (D.C. Cir. 2009) ...............................................................................17

*Genus Lifesciences, Inc. v. Azar*,
   486 F. Supp. 3d 450 (D.D.C. 2020) .......................................................................40

*Glob. Crossing Telecomms., Inc. v. FCC*,
   259 F.3d 740 (D.C. Cir. 2001) ...............................................................................22

*Globalstar, Inc. v. FCC*,
   564 F.3d 476 (D.C. Cir. 2009) ...............................................................................19

*Greater New Orleans Fair Hous. Action Ctr. v. Dep't of Hous. & Urb. Dev.*,
   639 F.3d 1078 (D.C. Cir. 2011) .............................................................................43

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ...............................................................................................29

*Hoechst-Roussel Pharms., Inc. v. Lehman*,
   109 F.3d 756 (Fed. Cir. 1997) ..........................................................................30, 31

*Holistic Candlers & Consumers Ass'n v. FDA*,
   664 F.3d 940 (D.C. Cir. 2012) ...............................................................................16

*Island Intell. Prop., LLC v. TD Ameritrade, Inc.*,
   2022 WL 1608044 (E.D. Tex. May 20, 2022) .......................................................39

*Jamison v. FTC*,
   628 F. Supp. 1548 (D.D.C. 1986) ..........................................................................13

*King v. Burwell*,
   576 U.S. 473 (2015) ...............................................................................................21

*\*Kordel v. United States*,
   335 U.S. 345 (1948) ..........................................................................................34, 35

*Koretoff v. Vilsack*,
   707 F.3d 394 (D.C. Cir. 2013) ...............................................................................19

*In re Lantus Direct Purchaser Antitrust Litig.*,
  950 F.3d 1 (1st Cir. 2020) ................................................................. 30

*In re LaPorta*,
  332 B.R. 879 (Bankr. D. Minn. 2005) ............................................... 22

*LG Elecs. U.S.A., Inc. v. Dep't of Energy*,
  679 F. Supp. 2d 18 (D.D.C. 2010) .................................................... 44

*Muskin v. State Dep't of Assessments & Tax'n*,
  30 A.3d 962 (Md. 2011) ..................................................................... 23

*Mylan Pharms. v. Celgene Corp.*,
  2018 U.S. Dist. LEXIS 242826 (D.N.J. Oct. 3, 2018) ...................... 37

*Nasdaq Stock Market LLC v. SEC*,
  1 F.4th 34 (D.C. Cir. 2021) ......................................................... 15, 16

*Nielsen v. Preap*,
  139 S. Ct. 954 (2019) ........................................................................ 24

*Niz-Chavez v. Garland*,
  141 S. Ct. 1474 (2021) ...................................................................... 39

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ............................................................................ 40

**Nostrum Pharms., LLC v. FDA*,
  35 F. 4th 820 (D.C. Cir. 2022) .............................................. 11, 13, 16

*Ohio Edison Co. v. Zech*,
  701 F. Supp. 4 (D.D.C. 1988) ........................................................... 13

*Oil, Chem. & Atomic Workers Int'l Union v. Zegeer*,
  768 F.2d 1480 (D.C. Cir. 1985) ........................................................ 14

*Par Pharms., Inc. v. TWI Pharms., Inc.*,
  2014 WL 3956024 (D. Md. Aug. 12, 2014) ...................................... 44

*Pharm. Mfg. Rsch. Servs., Inc. v. FDA*,
  957 F.3d 254 (D.C. Cir. 2020) .................................................... 16, 20

*Sandoz, Inc. v. Leavitt*,
  427 F. Supp. 2d 29 (D.D.C. 2006) .................................................... 41

*Sanofi-Synthelabo v. Apotex, Inc.*,
  470 F.3d 1368 (Fed. Cir. 2006) ........................................................ 44

*Sierra Club v. Wheeler*,
  956 F.3d 612 (D.C. Cir. 2020) .......................................................... 20

*Soundboard Ass'n v. FTC*,
  888 F.3d 1261 (D.C. Cir. 2018) ........................................................ 16

**Telecomms. Rsch. & Action Ctr. v. FCC*,
  750 F.2d 70 (D.C. Cir. 1984) ....................................... 13, 15, 17, 42

*United Food & Com. Workers Local 1776 & Particpating Emps. Health &*
  *Welfare Fund v. Takeda Pharm. Co.*,
  11 F.4th 118 (2d Cir. 2021) ........................................................................31

*United States v. 24 Devices*,
  202 F. Supp. 147 (D.N.J. 1962) .................................................................36

*United States v. Alberty Food Prods.*,
  98 F. Supp. 23 (S.D. Cal. 1951) .................................................................35

*United States v. 24 Bottles 'Sterling Vinegar & Honey'*,
  338 F.2d 157 (2d Cir. 1964).......................................................................36

*United States v. Urbuteit*,
  335 U.S. 355 (1948) ...................................................................................34

*United States v. Urbuteit*,
  336 U.S. 804 (1949) ..............................................................................34, 35

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
  578 U.S. 590 (2016) ...................................................................................17

*Vill. of Barrington v. STB*,
  636 F.3d 650 (D.C. Cir. 2011) ..............................................................19, 29

*ViroPharma, Inc. v. Hamburg*,
  898 F. Supp. 2d 1 (D.D.C. 2012) ...............................................................28

*ViroPharma, Inc. v. Hamburg*,
  916 F. Supp. 2d 76 (D.D.C. 2013) .............................................................28

*Watson Pharms., Inc. v. Henney*,
  194 F. Supp. 2d 442 (D. Md. 2001) ...........................................................31

*Wisconsin v. Indivior Inc.*,
  2017 U.S. Dist. LEXIS 179101 (E.D. Pa. Oct. 30, 2017).........................37

*Women's Equity Action League v. Cavazos*,
  906 F.2d 742 (D.C. Cir. 1990) ...................................................................17

*Wyeth v. Levine*,
  555 U.S. 555 (2009) ...................................................................................22

**Statutes and Regulations**

1 U.S.C. § 1.......................................................................................................38

5 U.S.C. § 704.............................................................................................15, 18

5 U.S.C. § 706(2) ..............................................................................................17

21 U.S.C. § 321(m)(2) ......................................................................................34

21 U.S.C. § 331(a) ..............................................................................................7

21 U.S.C. § 331(d) ............................................................................................29

21 U.S.C. § 352(f)(1) ........................................................................................36

\*21 U.S.C. § 355-1(a)(1) ...........................................................................5, 27, 33

21 U.S.C. § 355-1(e)(2) ...................................................................................36

21 U.S.C. § 355-1(f)(1) ....................................................................................27

21 U.S.C. § 355-1(f)(8) ....................................................................................29

21 U.S.C. § 355(b)(1) ....................................................................................8, 27

\*21 U.S.C. § 355(b)(2) .........................................................1, 2, 8, 20, 32, 33

21 U.S.C. § 355(b)(3) .......................................................................................24

21 U.S.C. § 355(c)(2) ........................................................................................27

\*21 U.S.C. § 355(c)(3) ......................................................1, 11, 12, 18, 23, 40

21 U.S.C. § 355(d) ...................................................................................7, 22, 32

21 U.S.C. § 355(d)(6) ............................................................................10, 18, 26

21 U.S.C. § 355(d)(7) ........................................................................................21

21 U.S.C. § 355(e) .............................................................................................22

21 U.S.C. § 355(e)(5) ............................................................................18, 20, 26

\*21 U.S.C. § 355(h) ............................................................11, 13, 14, 17

21 U.S.C. § 355(p)(1) ........................................................................................29

21 U.S.C. § 355(v)(3) ........................................................................................28

21 U.S.C. § 355a .................................................................................................7

21 U.S.C. § 356(a)(1) ..........................................................................................8

21 U.S.C. § 360cc(c)(2) .......................................................................................4

21 U.S.C. § 379g ..................................................................................................9

21 U.S.C. § 841(g)(2) ..........................................................................................5

Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 ......................................................................................25

Food and Drug Administration Amendments Act of 2007, Pub. L. No. 110-85, 121 Stat. 823 .............................................................................................5, 29, 30

Further Consolidated Appropriations Act, 2020, Pub. L. No. 116–94, 133 Stat. 2534 (2019) .....................................................................................................30

Orange Book Transparency Act of 2020, Pub. L. No. 116-290, 134 Stat. 4889 (2021) ............................................................................................................27

21 C.F.R. § 1.3(a) ..............................................................................................34

21 C.F.R. § 10.33 ...............................................................................................10

21 C.F.R. § 10.75 ...............................................................................................10

21 C.F.R. § 12.87(d) ..........................................................................................22

21 C.F.R. § 201.100(c)(1) ...................................................................................36

21 C.F.R. § 201.100(d)(3) ...................................................................................36

21 C.F.R. § 208.1(c) ............................................................................................36

21 C.F.R. § 314.3 ..............................................................................................3, 7

21 C.F.R. § 314.50(i)(1)(iii)(A)-(B) ....................................................................36

21 C.F.R. § 314.50(*l*)(1)(i) .................................................................................37

21 C.F.R. § 314.53(f)(1)(ii) .................................................................................32

21 C.F.R. § 314.54(a)(1)(iii) .................................................................................8

21 C.F.R. § 314.54(a)(1)(vi) ..................................................................................8

21 C.F.R. § 314.110(a) ........................................................................................11

21 C.F.R. § 314.110(b)(3) ..............................................................................11, 14

21 C.F.R. § 314.125(a)(7) ........................................................................10, 20, 26

21 C.F.R. § 314.235 .......................................................................................11, 14

21 C.F.R. § 314.520 ..............................................................................................5

73 Fed. Reg. 16,313 (Mar. 27, 2008) ...................................................................5

**Legislative Material**

GAO, *Generic Drug Development: Stakeholders' Views of REMS Differ* (Oct. 2019) ...................................................................................................................37

## INTRODUCTION

This lawsuit stems from Avadel's adoption of an aggressive business and regulatory strategy that foundered on legal problems that were entirely predictable–and in fact were predicted by many. Avadel adopted a business strategy of divesting all of its revenue-generating assets and placing its whole stake on a single drug application. Avadel's regulatory strategy was to seek approval of a narcolepsy drug using oxybate, the same active moiety (i.e., the part of the drug responsible for pharmacological action) contained in XYREM and XYWAV, drugs marketed by Defendant-Intervenor Jazz Pharmaceuticals, Inc. ("Jazz"). Avadel sought to do so without the enormous investments that ordinarily accompany a full drug approval. It opted to use the drug approval path marked by Section 505(b)(2) of the Food Drug and Cosmetic Act (FDCA). That is, Avadel chose to identify XYREM as the "listed drug" for its application, and to rely on the safety and efficacy data that Jazz and its predecessor developed for XYREM over many years.

That choice of regulatory pathway comes at a cost. Congress commanded that such applications "shall also include … a certification … with respect to each patent which claims the drug for which such investigations were conducted or which claims a use for such drug for which the applicant is seeking approval under this subsection." 21 U.S.C. § 355(b)(2)(A). Congress included this provision in the pivotal 1984 Hatch-Waxman Amendments to the FDCA because it correctly anticipated that many such applications would implicate patents held by the sponsor of the "listed drug." The certification requirement facilitates the original sponsor's identification of actual or potential patent issues so any conflicts may be worked out during the approval process— including through patent litigation if necessary. *See id*. When such a certification triggers patent litigation, FDA generally is barred from approving the drug application for a 30-month period, unless events in the patent litigation clear the way sooner.  *See id.* § 355(c)(3).

Avadel's "regulatory strategy" was the gamble that it could obtain FDA approval to bring an oxybate-based narcolepsy drug to market *without* certifying to Jazz's relevant patent. Avadel instead provided a statement that Jazz's method of use patent does not claim "a use for which [Avadel] is seeking approval under this subsection," *see id.* § 355(b)(2)(B). But, ███████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████

Avadel's attempt to overturn that decision through litigation is just as aggressive and unsound as the decisions that led here. Avadel seeks to blow through the constraints that Congress imposed on judicial review of drug applications (final orders only, and only in the court of appeals). It attempts to deny FDA authority to review the claims that an applicant makes in an application submitted to the agency, and in doing so to give drug sponsors powerful incentives to ignore the patent certification requirements integral to the Hatch-Waxman regime. It ignores settled law on the meaning of key concepts of drug regulation, such as labeling. And it caps all of this by implausibly asking the Court to order FDA to issue a final approval decision—an ask that all but concedes that there is no final agency action present now, ignores that Avadel and Jazz are presently litigating over the relevant patent in the District of Delaware, ███████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████ For these reasons, and others identified below, the Court should deny Avadel's motions and grant summary judgment to the defendants.

**BACKGROUND**

I.    **FACTUAL BACKGROUND**

    A.    **FDA-Approved Treatments For Narcolepsy**

        Narcolepsy is a rare, chronic, and incurable sleep disorder, characterized by cataplexy (sudden loss or weakening of muscle control) and excessive daytime sleepiness ("EDS"), among other symptoms. Jazz manufactures two important treatments for narcolepsy. FDA approved XYREM® (sodium oxybate) oral solution, to treat cataplexy in adult narcolepsy patients in 2002, to treat EDS in adult narcolepsy patients in 2005, and to treat cataplexy and EDS in narcolepsy patients ages 7 years and older in 2018. Griffin Exs. 1-3 (*Xyrem Approval Letters*).[1] FDA approved XYWAV® (calcium, magnesium, potassium, and sodium oxybates) oral solution, to treat cataplexy and EDS in narcolepsy patients ages 7 years and older in July 2020, and to treat idiopathic hypersomnia (IH) in adults in August 2021. Griffin Exs. 4-5 (*Xywav Approval Letters*). Because narcolepsy is a chronic and incurable disease, XYREM and XYWAV are both intended to be taken on a nightly, long-term basis.

        The active moiety of both XYWAV and XYREM is oxybate, also known as gamma hydroxybutyrate or "GHB." *See* 21 C.F.R. § 314.3 (defining active moiety). Xyrem is the sodium salt of oxybate. When patients take Xyrem at the highest FDA-approved dose, they receive 1640 mg sodium from the drug every night, Griffin Ex. 6 (*XYREM® Prescribing Information*), which represents 71% of the maximum daily sodium intake of 2,300 mg/day recommended by the American Heart Association ("AHA"). Griffin Ex. 7 (AHA, *How Much Sodium Should I Eat Per Day.*). High levels of nightly sodium intake among narcolepsy patients is a concern because narcolepsy patients have an increased baseline incidence of high blood pressure, high cholesterol

---

[1] All Exhibits are attached to the Declaration of Sean C. Griffin accompanying this motion.

and heart disease, as well as increased risks of stroke, heart attack, and heart failure. Griffin Ex. 8

(AHA, *Best Known as a Sleep Disorder, Narcolepsy May Also Impact Heart Health*).

XYWAV significantly improves on this situation by binding a mix of cations to oxybate,

resulting in a 92% decrease in nightly sodium exposure at the highest approved dose. Based on

that reduction, XYWAV is one of nine drugs recognized by FDA as "clinically superior" since

that term was added to the Orphan Drug Act in 2017. *See* 21 U.S.C. § 360cc(c)(2). FDA

determined that XYWAV

> is clinically superior to Xyrem by means of greater safety because
> Xywav provides a greatly reduced chronic sodium burden compared
> to Xyrem. The differences in the sodium content of the two products
> at the recommended doses will be clinically meaningful in reducing
> cardiovascular morbidity in a substantial proportion of patients for
> whom the drug is indicated.

Griffin Ex. 9 (*Clinical Superiority Findings*). Due to FDA's clinical superiority finding, XYWAV

earned a new period of orphan drug exclusivity ("ODE") pursuant to 21 U.S.C. § 360cc(c)(1).

Unless a statutory exception to that exclusivity applies, FDA cannot lawfully approve another

oxybate product to treat patients with narcolepsy until July 21, 2027.[2]

However, FDA can and has approved non-oxybate products as treatments for narcolepsy

or its symptoms. This includes established products (i.e., drugs with generics) like PROVIGIL®

(modafinil); NUVIGIL® (armodafinil); RITALIN® (methylphenidate hydrochloride); and

DEXEDRINE® (dextroamphetamine sulfate). Griffin Exs. 10-13 (*Professional Labeling for

PROVIGIL®, NUVIGIL®, RITALIN®, and DEXEDRINE®*). It also includes recent innovative

drugs like SUNOSI® (solriamfetol), which was approved by FDA in March 2019 as a treatment

for EDS associated with narcolepsy, and WAKIX® (pitolisant), which was approved by FDA in August 2019 for the treatment of EDS in adults with narcolepsy and in October 2020 for the treatment of cataplexy in adults with narcolepsy. Griffin Exs. 14-15 (*Professional Labeling for SUNOSI® and WAKIX®*). Thus, although there remains no cure for narcolepsy, the available treatment options are relatively robust, particularly when they are compared to the absolute lack of an approved treatment for certain other rare diseases.

### B.     Jazz's REMS And The '963 Patent

Oxybate/GHB is a central nervous system (CNS) depressant, and illicit GHB is a Schedule I controlled substance. Abuse or misuse of GHB is associated with CNS adverse reactions, including seizure, respiratory depression, decreased consciousness, coma, and death. Griffin Ex. 6 at 1. GHB also has been associated with drug-assisted sexual assault, *see, e.g.*, 21 U.S.C. § 841(g)(2)(A), indicating that abuse, misuse, or diversion of oxybate can lead to especially harmful outcomes.

To help mitigate these and other risks, oxybate is available only through a restricted distribution program approved by FDA under its statutory obligation to require a "risk evaluation and mitigation strategy" ("REMS") when "necessary to ensure that the benefits of the drug outweigh the risks of the drug." 21 U.S.C. § 355-1(a)(1). When XYREM was first approved for cataplexy in 2002, Jazz's distribution program was approved by FDA as a "risk management program" pursuant to 21 C.F.R. § 314.520. By the time XYREM was approved to treat EDS in 2005, FDA had started to refer to such programs as risk minimization action plans ("RiskMAPs"). Griffin Ex. 16 (*FDA RiskMAPs Guidance*). In 2007, Congress added section 505-1 to the FDCA, *see* 21 U.S.C, § 355–1(a)(1), and "deemed" existing restricted distribution programs to be a REMS. *See* Pub. L. No. 110-85, § 909, 121 Stat. 823, 950; *see also* 73 Fed. Reg. 16,313 (Mar. 27, 2008) (confirming XYREM was among the drugs with a deemed REMS). ████████████████

███████████████████████. Today, a single REMS program is used to restrict the distribution of both XYREM and XYWAV. Ex. 17 (*FDA News Release* (Aug. 12, 2021)). Within this tightly controlled program, only a "certified prescriber" may prescribe oxybate, and only to enrolled patients. *Id.* at 2. The drugs can be dispensed only by a single "certified pharmacy," and neither is "available in retail pharmacies." *Id.*

A critical element of the XYREM and XYWAV REMS is the use of a computer database to track every prescriber, patient, prescription, and risk management event. Pharmacists must consult those data while counseling patients, consulting with prescribers, dispensing oxybate, and monitoring for abuse, misuse, and diversion.[3] Using the database to comprehensively track this information "ensures that only registered prescribers and patients have access to the product, and allows the pharmacy to track product shipment and delivery and monitor usage and refill patterns to identify potential misuse, abuse, or diversion." Griffin Ex. 18 at 3 (*Ltr. from FDA to Jazz Pharms.* (Dec. 13, 2012)).



███████████  The '963 patent will expire on June 17, 2023, when a six-month extension for

pediatric exclusivity expires under 21 U.S.C. § 355a.

### C.   Avadel's Gamble On FT218 And Refusal To Certify To The '963 Patent

For several years, Avadel has been trying to gain FDA's approval for an investigational

sodium oxybate product called "FT218."[4] ████████████████████████████████



██████  As an oxybate product, FT218 contains the same active moiety as XYREM and

XYWAV. *See* 21 C.F.R. § 314.3. As a sodium oxybate product, FT218 ███████████

██████████████████████████████████████████████████████████████

██████████████████

Avadel repeatedly mentions that it has no sources of revenue beyond FT218, Mem. 1, 2,

38, but that was not always the case. *Cf.* Griffin Ex. 20 at 1 (*Remarks from Avadel's CEO*) ("Avadel

… has been around for over 30 years [and] has gone through quite a transformation over the last

two-and-a-half to nearly three years.…"). In 2018, Avadel began divesting its revenue-generating

assets. *See* Griffin Ex. 21 (*Avadel Q1 2018 Results*). In 2020, Avadel sold its remaining revenue-

generating assets. Griffin Exs. 22-23 (*Avadel Press Releases*). Since then, Avadel has been

"singularly focused on supporting the regulatory approval process, market planning and

maximizing shareholder value for FT218." Griffin Ex. 22 (*Avadel Press Release*).

Despite going "all in" on FT218, Avadel chose not to conduct all of the clinical studies and

other investigations necessary to obtain full approval of FT218 under section 505(b)(1) of the

FDCA. ████████████████████████████████████████████████████

---

[4] "LUMRYZ" is the proposed brand name for FT218. Because an investigational new drug product
like FT218 cannot be marketed in the United States, 21 U.S.C. §§ 331(a), 355(d), it is more
appropriate to refer to the drug by its investigational moniker.

██████████████████████████████████████████████████████████████████

████████████████████████ That choice reflects Avadel's decision to rely on the safety and efficacy data that Jazz and its predecessor developed for XYREM over the course of many years. *See* 21 C.F.R. § 314.54(a)(1)(iii).

Under the FDCA, the choice to file under section 505(b)(2) had a cost: Avadel was by default required to certify to each patent listed in the *Orange Book* for XYREM, including the '963 patent. *See* 21 U.S.C. § 355(b)(2)(A), 21 C.F.R. § 314.54(a)(1)(vi). Avadel chose to instead submit a "section 505(b)(2)(B) statement," which represents to FDA that an application does not seek approval for any protected use. 21 U.S.C. § 355(b)(2)(B). Avadel thus represented to FDA—in December 2020—that it was not seeking approval for any use covered by the '963 patent because

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████

## II.   PROCEDURAL BACKGROUND

### A.   FDA's Review Of Avadel's Application

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████ FDA's target date for an action on

Avadel's application was ten months after Avadel's application was filed—October 15, 2021—

pursuant to the Prescription Drug User Fee Act ("PDUFA"), 21 U.S.C. § 379g. Avadel

characterizes the ten-month PDUFA goal as a proposal by FDA to modify 21 U.S.C. § 355(c)(1),

to which Avadel then assented. Mem. at 4, 13, 41, 42. The administrative record contains no

evidence of such offer and acceptance. In any event, PDUFA action dates are merely goals. Griffin

Ex. 25 at 4 (*PDUFA Reauthorization Performance Goals*) ("Review and act on 90 percent of

standard non-NME original NDA submissions within 10 months of receipt."). The need for

flexibility is particularly acute for applications filed during a declared public health emergency.

Griffin Ex. 26 at 79 (*FDA FY2021 PDUFA Report*) ("the continuation of the COVID-19 pandemic

required the Agency to prioritize submissions related to COVID-19, utilizing its limited resources

to appropriately address the public health emergency").

### B.    FDA's Rejection Of Avadel's Section 505(b)(2)(B) Statement

Avadel publicly refers to its decision to omit a patent certification as a "filing strategy."

*See, e.g.*, Griffin Ex. 27 at 1 (*Q2 2021 Avadel Pharmaceuticals PLC Earnings Call*) ("As we have

stated before, we have developed and strategically executed our FT218 regulatory filing such to

effectively navigate any potential barriers or regulatory issues related to this 505(b)(2) filing.").

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████ Avadel kept telling the investing community,

which was closely tracking the issue, that its filing strategy would be fine.  Ex. 28 at 2 (*Avadel

Remarks at Global Investment Conference*) ("[w]e have not been asked by the FDA to certify");

Ex. 20 at 2 (asking Avadel to confirm that if FDA required "any certification, Paragraph IV

anything like that, this would just have to be disclosed to the investment community. Is that fair?").



Avadel continued to tell the investment community that it saw no need for a patent certification. Griffin Ex. 29 at 1 (*Q3 2021 Avadel Pharmaceuticals PLC Earnings Call*) ("we still have not been asked by the agency to certify"); Ex. 30 at 1 (*Avadel Remarks at Evercore ISI HealthCONx Virtual Conference*) (asking Avadel "at what point in FDA review does FDA ask for patent certification[?]"); Ex. 31 at 3 (*Avadel Remarks at SVB Leerink Global Healthcare Virtual Conference*) ("we didn't learn anything that makes us question our regulatory filing strategy).

*see* 21 U.S.C. § 355(d)(6); 21 C.F.R. § 314.125(a)(7).

### C.    Avadel's Decision To Submit A Patent Certification

Avadel still had open options for review within the agency. Avadel could have sought reconsideration or supervisory review by a more senior official. *See* 21 C.F.R. §§ 10.33, 10.75. Indeed, even a simple act of disagreement would have led FDA to issue a Complete Response

Letter ("CRL") formally stating that the agency would not approve the application without a patent certification. *See* 21 C.F.R. § 314.110(a); *see also, e.g.*, Griffin Ex. 32 (CRL for ANDA 200816). A CRL would have provided Avadel with an opportunity to press its position through a formal evidentiary hearing on the record. *See* 21 C.F.R. § 314.110(b)(3). A loss at such a hearing would result in a final order of refusal, reviewable directly in the Court of Appeals. *See* 21 U.S.C. § 355(h); 21 C.F.R. § 314.235; *see also Nostrum Pharms., LLC v. FDA*, 35 F. 4th 820, 822–23 (D.C. Cir. 2022).

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

Avadel then spun the TA as an important regulatory success. Ex. 33 at 1 (*Avadel Press Release* (July 19, 2022)) (describing the TA Letter as "a critical milestone"); Ex. 34 at 2 (*Avadel Press Release* (June 29, 2022) ("a tentative approval … will validate the clinical efficacy and safety profile of FT218 … and will provide clarity on the timing and pathway to a potential final approval and subsequent commercial launch.").

### D.    Ongoing Patent Litigation Between Jazz And Avadel

Jazz and Avadel are litigating the '963 patent in the U.S. District Court for the District of Delaware. Jazz sued Avadel there in May 2021, alleging infringement of the '963 patent, among others. *See Jazz Pharms., Inc. v. Avadel CNS Pharms., LLC.*, No. 1:21-cv-00691-MN (D. Del.) (*Jazz*). Avadel counterclaimed, seeking to compel Jazz to delete Use Code 1110 and remove the '963 patent from the Orange Book under 21 U.S.C. § 355(c)(3)(D)(ii)(I). *See Jazz*, ECF No. 11, at 41-42. Avadel sought judgment on the pleadings with respect to that counterclaim on July 23, 2021. *Id.*, ECF No. 20. District Judge Maryellen Noreika denied that motion, but Avadel has since attempted to renew it. *Id.*, ECF Nos. 56, 117.

More recently, upon receiving "notice of [Avadel's] opinion that [the '963] patent is invalid or will not be infringed" under § 355(b)(3), Jazz filed an additional patent infringement lawsuit, *see Jazz Pharms., Inc. v. Avadel CNS Pharms., LLC*, No. 1:22-cv-00941-MN (D. Del.) (filed July 15, 2022), which triggered the thirty-month stay of approval under 21 U.S.C. § 355(c)(3)(C). Divis Decl. ¶ 41. The stay precludes approval of FT218 until expiration of the '963 patent term and the related pediatric exclusivity in June 2023. *Id.*

### E.   Unresolved Orphan Drug Exclusivity Questions

Avadel has publicly stated that the patent certification issue is the only remaining obstacle to full approval of FT218. *See, e.g.*, Compl. ¶ 28 ("FDA has never suggested that there is any remaining obstacle to NDA approval, apart from this patent certification"); Mem. 41 (the TA Letter "confirms that, apart from the REMS patent certification, there are no scientific issues remaining outstanding"). However, the May 24th letter from ███████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████

## ARGUMENT

When reviewing agency action under the APA, "the district court 'sits as an appellate tribunal'" and reviews "the entire case" as "a question of law." *Athenex Inc. v. Azar*, 397 F. Supp. 3d 56, 63 (D.D.C. 2019). The Court's role, after satisfying itself that it has jurisdiction, is to

"determin[e] whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Id.* (quoting *Philip Morris USA Inc. v. FDA*, 202 F. Supp. 3d 31, 45 (D.D.C. 2016)).

## I.     THE COURT SHOULD ENTER JUDGMENT AGAINST AVADEL.

### A.     Section 505(h) of the Food Drug and Cosmetic Act Removes This Court's Jurisdiction To Address Avadel's Claims.

When Congress vests the courts of appeals with authority to review final agency decisions, that decision also strips district courts of authority to hear "interlocutory claim[s]" that may arise along the path to a final order. *Air Line Pilots Ass'n, Int'l v. Civ. Aeronautics Bd.*, 750 F.2d 81, 88 (D.C. Cir. 1984); *see Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 78–79 (D.C. Cir. 1984) ("*TRAC*") ("[W]here a statute commits review of agency action to the Court of Appeals, any suit seeking relief that might affect the Circuit Court's future jurisdiction is subject to the exclusive review of the Court of Appeals."); *Jamison v. FTC*, 628 F. Supp. 1548, 1552 n.4 (D.D.C. 1986) ("Since resolution of [the] question plainly could affect the Circuit Court's future jurisdiction, that question must be answered by the court of appeals." (citation and quotation marks omitted)); *Ohio Edison Co. v. Zech*, 701 F. Supp. 4, 7 (D.D.C. 1988) ("[The district court] has no general federal question jurisdiction over interlocutory appeals from agency action or inaction when a statute vests review over final agency action in the court of appeals." (quotation marks omitted)).

That rule applies squarely here. FDCA Section 505(h), 21 U.S.C. § 355(h), gives the courts of appeals exclusive jurisdiction to review "an order of the Secretary refusing or withdrawing approval of an application under this section." *See Nostrum*, 35 F.4th at 825 ("our review is limited to final rejections of drug applications, not interim decisions or nonbinding statements subject to further review or change"). Correspondingly, this Court lacks jurisdiction to review not only final orders, but also interlocutory orders and allegations that the agency has unreasonably delayed or

unreasonably withheld final action. *See, e.g.*, *Oil, Chem. & Atomic Workers Int'l Union v. Zegeer*, 768 F.2d 1480, 1485 (D.C. Cir. 1985). This Court therefore lacks subject-matter jurisdiction over both of Avadel's Counts. Count I challenges FDA's May 24th letter, which it dubs the "Patent Decision." The Patent Decision is classically interlocutory. Even the complaint describes the Patent Decision as having resolved "only one discrete subcomponent" of Avadel's new drug application. Compl. ¶ 10; *see also* Compl ¶ 81 (Patent Decision "finally informed Avadel of [FDA's] final decision on one aspect of the NDA").

That concession is clearly correct. The Patent Decision neither approved nor denied, nor otherwise finally resolved, Avadel's new drug application. For instance, the Patent Decision did not address the effect of the unexpired ODE covering XYWAV, and thus did not determine whether FT218 is approvable. The Patent Decision instead articulated FDA's view that Avadel's application contained a deficiency that, if uncorrected, would require FDA to issue a CRL. Avadel then acquiesced in FDA's view (if "under protest") by correcting the deficiency and submitting a patent certification, but that decision does not alter the interlocutory nature of the Patent Decision. If Avadel had stuck to its guns, FDA would have issued a CRL and the substance of the Patent Decision would have been reviewable through a hearing, *see* 21 C.F.R. § 314.110(b)(3), and then judicial review directly in the Court of Appeals, *see* 21 U.S.C. § 355(h); 21 C.F.R. § 314.235. Avadel simply opted for a different path that has not yet produced a final order.

Count II, which alleges unreasonable delay, is equally barred. Again, where a statute vests the courts of appeals with exclusive jurisdiction to review a final decision of the agency, as Section 505(h) undeniably does, that grant of exclusive jurisdiction encompasses claims that the agency has unreasonably delayed or unlawfully withheld a final decision. *See Zegeer*, 768 F.2d at 1485;

*TRAC*, 750 F.2d at 75–79. Section 505(h) thus blocks Avadel's attempt to bring its unreasonable delay claim to this Court.

### B.    Avadel Has No Cause of Action under the APA.

The APA authorizes judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Unless a plaintiff meets these "threshold" requirements, "the action is not reviewable." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006). Avadel falls doubly short.

### 1.    The Patent Decision Is Not Final Agency Action.

For an agency action to be final, "two conditions must be satisfied." *Bennett v. Spear*, 520 U.S. 154, 177 (1997). First, the action "must not be of a merely tentative or interlocutory nature," but instead "must mark the 'consummation' of the agency's decisionmaking process." *Id.* at 177–78. Second, the action must determine "rights or obligations" or create "legal consequences." *Id.* at 178 (citation omitted).

"[F]inality must be measured in relation to the agency's entire process, not just 'one phase of the process.'" *Nasdaq Stock Market LLC v. SEC*, 1 F.4th 34, 39 (D.C. Cir. 2021). To that end, courts assess "what the [agency] has said" about its process, *id.* at 38, and the "idiosyncratic regime of statutes and regulations that govern" it, *Cal. Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 632 (D.C. Cir. 2019). For instance, the D.C. Circuit's *Nasdaq* decision involved a multi-step SEC rulemaking process. Step one: order stock exchanges to propose a new data-governance plan. *See Nasdaq*, 1 F.4th at 38. Step two: seek public comments on the plan. *Id.* at 36. Step three: promulgate a revised plan. After the SEC issued its step-one order, the stock exchanges petitioned for review. All parties argued that the order was final, but the D.C. Circuit disagreed because the order "flunk[ed] the first element of the *Bennett* test" insofar as the plan was "subject to further notice, comment, and revision." *Id.* at 37, 39. In other words: the "entire process" remained

"unconsummated," so the order finalizing "one phase of the process" was "'merely tentative' and 'interlocutory.'" *Id.* at 38–39 (quoting *Bennett*, 520 U.S. at 178).

The same is true here. FDA's review of an NDA is a "multi-step" process, culminating in a "final decision on the application." *Nostrum*, 35 F.4th at 825. That decision will be a final agency action. *See, e.g.*, *Pharm. Mfg. Rsch. Servs., Inc. v. FDA*, 957 F.3d 254 (D.C. Cir. 2020). But FDA isn't there yet. In fact, Avadel *concedes* the Patent Decision resolved "only one discrete subcomponent" of the drug-approval process. Compl. ¶ 10. And Avadel asserts that "FDA should be directed to take final action on the [FT218] NDA." Compl. ¶ 135. Avadel's concessions that FDA has not taken "final action" on its new drug application are plainly correct. The Patent Decision explicitly ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

FDA "signaled that its thinking about the [application] is not final." *Nasdaq*, 1 F.4th at 38; *see Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 945 (D.C. Cir. 2012) (no final action when FDA asked for "further information," which it would "use to decide whether [the] product[s] may be legally marketed" (quotation marks omitted)). Likewise, the "regime of statutes and regulations," *Cal. Cmtys.*, 934 F.3d at 632, confirms that the deficiency letter is merely interlocutory. After receiving the Patent Decision, Avadel had two options: stand its ground and draw a CRL or acquiesce to FDA's position. Avadel chose the latter, but even if Avadel had drawn a CRL, the dispute would still be over "only a preliminary step in the agency's scientific review process." *Nostrum*, 35 F.4th at 826. And because *Nostrum* holds that a CRL is not final, it must be true that the prior step in the chain (a pre-CRL deficiency letter) is also non-final.

There is "no need to reach the second *Bennett* prong if the action does not mark the consummation of agency decisionmaking." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1271 (D.C.

Cir. 2018).  But FDA's actions in this case are also nonfinal because they did not "give[] rise to 'direct and appreciable legal consequences.'" *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016). Here, the Patent Decision carried no direct legal consequence—it simply put Avadel on notice that, subject to further agency review, FDA would likely reject Avadel's preferred filing strategy and put Avadel to a choice about what to do next. As a result, the Patent Decision is not final.

### 2.    Avadel Has Other Adequate Remedies.

Finality aside, the APA "authorizes review only when" a plaintiff lacks other adequate remedies. *Bennett*, 520 U.S. at 161–62; *see* 5 U.S.C. § 704. Courts thus ask whether any other statute "provides an independent cause of action or an alternative review procedure." *El Rio Santa Cruz Neighborhood Health Ctr. v. HHS*, 396 F.3d 1265, 1270 (D.C. Cir. 2005). The alternative "need not provide relief identical to relief under the APA," nor does it have to be "as effective as an APA lawsuit." *Garcia v. Vilsack*, 563 F.3d 519, 525 (D.C. Cir. 2009); *see also Women's Equity Action League v. Cavazos*, 906 F.2d 742, 751 (D.C. Cir. 1990) (adequate remedy may be "imperfect," "more arduous, and less effective"). Here, APA review is "precluded" because Avadel has two types of adequate, alternative remedies. *El Rio*, 396 F.3d at 1271.

*First,* Avadel can seek appropriate review in the courts of appeals, which as explained above, may review final orders "refusing or withdrawing approval of" a new-drug application. 21 U.S.C. § 355(h). The relief offered there would be of the same genre as that sought here. *Compare id.* (court may "set aside" FDA final order) *with* 5 U.S.C. § 706(2) (court shall "hold unlawful and set aside agency action"). "Where statutory review is available in the Court of Appeals it will rarely be inadequate." *TRAC*, 750 F.2d at 78.

*Second*, the relief that Avadel seeks in this case is to be relieved of the obligation to submit a patent certification. That relief can be obtained by obtaining a court order removing the '963

patent from the Orange Book. To that end, 21 U.S.C. § 355(c)(3)(D)(ii) provides that if a patent owner "brings a patent infringement action against [a new drug] applicant," the applicant may countersue to compel the patent owner to "correct or delete the patent information." This option is not just theoretically available. Avadel has already brought this counterclaim in the District of Delaware, unsuccessfully moved for judgment on the pleadings, and is now seeking to revive its motion. That should leave no doubt that Avadel has options for suit elsewhere that are "adequate" within the meaning of 5 U.S.C. § 704.

### C.   Avadel Has Not Established A Legal Violation.

Summary judgment should be entered against Avadel because it has not established any legal violation. First, 21 U.S.C. § 355(d)(6) and 21 U.S.C. § 355(e)(5) impose a duty on FDA to reject inaccurate section 505(b)(2)(B) statements, regardless of the applicant's "opinion." Second, the '963 patent and Use Code 1110 are properly included in the *Orange Book*, which Avadel cannot challenge in this litigation. Third, FDA was required to review Avadel's proposed REMS to assess the accuracy of Avadel's statement. Fourth, FDA correctly determined that Avadel's proposed REMS seeks approval for the use covered described by Use Code 1110. Finally, FDA has not unlawfully withheld any action owed to Avadel.

### 1.   FDA Had Authority To Review Avadel's Statement.

Avadel gives top billing to a challenge to FDA's authority to review an applicant's section 505(b)(2)(B) statement. *See* Compl. ¶¶ 22, 123-24; Mem. 3, 20-24. Avadel's challenge fails both because it was waived and because it is meritless.

### a.   Avadel Waived Its Challenge To FDA's Authority.

A "hard and fast rule of administrative law, rooted in simple fairness" holds that arguments "'not raised before an agency are waived and will not be considered by a court on review.'" *Fritch v. U.S. Dep't of State*, 220 F. Supp. 3d 51, 62 (D.D.C. 2016) (Mehta, J.) (quoting *Coburn v.*

*McHugh*, 679 F.3d 924, 929 (D.C. Cir. 2012)); *see Koretoff v. Vilsack*, 707 F.3d 394, 398 (D.C. Cir. 2013) (per curiam) (plaintiff must press the same "specific argument" before the agency and "not merely the same general legal issue"). Here, Avadel failed to present its statutory authority argument in its submissions leading up to the Patent Decision. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ First, a single conclusory sentence is insufficient to preserve a challenge to an agency's authority. *See Vill. of Barrington v. STB*, 636 F.3d 650, 655-56 (D.C. Cir. 2011) (regulated entities must "forcefully present their arguments at the time appropriate under agency practice") (cleaned up). Second, arguments first raised after the agency's decision are waived. *See, e.g.*, *Globalstar, Inc. v. FCC*, 564 F.3d 476, 479 (D.C. Cir. 2009); *BNSF v. STB*, 453 F.3d 473, 479 (D.C. Cir. 2006). ████████████████████████████

████████████████████████████████████████████

████████████ "[S]imple fairness," *Fritch*, 220 F. Supp. 3d at 62, thus precludes Avadel from bringing its argument to court now.

### b.    FDA Was Required To Review Avadel's Statement.

Avadel boldly (and belatedly) claims that section 505 of the FDCA "does not provide for ***any*** FDA involvement in evaluating the appropriateness of patent certifications and statements." Mem. 20. Avadel ignores two provisions of section 505 and an implementing regulation, each of which requires FDA to review the accuracy of section 505(b)(2)(B) statements.

Avadel's argument relies on the phrase "in the opinion of the applicant and to the best of his knowledge" in subparagraph (A) of section 505(b)(2) ("Opinion Clause"). Set off by commas, the Opinion Clause is adjectival and modifies only the immediately preceding noun: "certification." *See Sierra Club v. Wheeler*, 956 F.3d 612, 617 (D.C. Cir. 2020) ("the rule of last antecedent 'provides that a limiting clause or phrase should ordinarily be read as modifying only the noun or phrase that it immediately follows'").

Avadel initially refused to provide a certification. It instead submitted a "statement" under subparagraph (B) of section 505(b)(2). *See* 21 U.S.C. § 355(b)(2)(B). That provision contains no equivalent to the Opinion Clause. The absence of such language shows that Congress intended for such a "statement" to be an unqualified representation of fact. *See, e.g.*, *Gallardo ex rel. Vassallo v. Marstiller*, 142 S. Ct. 1751, 1759 (2022) ("we must give effect to, not nullify, Congress' choice to include limiting language in some provisions but not others").

As a factual representation in an NDA, Avadel's statement was plainly within FDA's jurisdiction to review. Section 505(e)(5) requires FDA to "withdraw approval of an application" if it "contains any untrue statement of a material fact." 21 U.S.C. § 355(e)(5). That obligation has existed continuously since 1938 and is "an enforceable statutory directive," *Cutler v. Hayes,* 818 F.2d 879, 893 n.116 (D.C. Cir. 1987). Because it would be senseless to grant an approval that must be withdrawn, FDA incorporated section 505(e)(5) into its review of NDAs. *Cf. Pharm. Mfg. Rsch. Serv.*, 957 F.3d at 261 ("It would be incoherent to allow the FDA to withdraw approval of a drug … but not to allow the FDA to deny approval on the same grounds."). Thus, FDA "will refuse to approve" an application that "contains an untrue statement of a material fact." 21 C.F.R. § 314.125(a)(7). Avadel ignores both provisions even though they required FDA to review the accuracy of Avadel's patent statement and even though ████████████████████████

20

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████

Avadel further ignores section 505(d)(6), which provides additional justification for FDA's decision. Section 505(d)(6) requires FDA to "issue an order refusing to approve" any application that "failed to contain the patent information prescribed by subsection (b)." 21 U.S.C. § 355(d)(7). FDA thus had a statutory obligation to decide whether Avadel's application contained the "patent information prescribed by subsection (b)," a broad term that can include patent statement or certification, as appropriate, prescribed by section 505(b)(2)(A)-(B). *Cf. Caraco Pharm. Lab'ys, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 417–18 (2012) ("patent information" broad enough to include Use Codes). █████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████

More broadly, Avadel's claim that the Opinion Clause prohibits FDA from reviewing an applicant's statement would do violence to the statute. *See King v. Burwell*, 576 U.S. 473, 486 (2015) (courts must read a statute's "words 'in their context and with a view to their place in the overall statutory scheme'") (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120,

133 (2000)). The basic concept of Section 505 is that FDA must thoroughly review NDAs and refuse approval to those that are noncompliant. *See* 21 U.S.C. § 355(d)-(e). Congress also placed the burden of establishing an entitlement to approval on the applicant. *See Wyeth v. Levine*, 555 U.S. 555, 567 (2009); 21 C.F.R. § 12.87(d) (applicant "has the burden of proof in establishing … the right to approval"). It is telling that Avadel never attempts to explain how its reading of the Opinion Clause can be squared with the rest of the statutory scheme.

   c.   **The Opinion Clause Does Not Require FDA To Accept Untrue Statements.**

Avadel also misunderstands the general import of the Opinion Clause, which as noted, modifies the applicant's obligations with respect to a patent "certification."  Standing alone, a "certification" requires "the formal assertion in writing of some fact." *Glob. Crossing Telecomms., Inc. v. FCC*, 259 F.3d 740, 746 (D.C. Cir. 2001) (quoting Black's Law Dictionary 227 (6th ed. 1990)). A "certification" implies a high degree of confidence on the part of the speaker, and false certifications can carry legal consequences. In fact, some courts have held that a "certification" required by a federal statute must be made under the penalty of perjury. *See, e.g.*, *In re LaPorta*, 332 B.R. 879, 881 (Bankr. D. Minn. 2005) (citing 28 U.S.C. § 1746).

The Opinion Clause moderates that expectation by indicating that a certification under section 505(b)(2)(A) need not be sworn or attest to the truth of any fact in absolute terms. *See Blanton v. Off. of the Comptroller of Currency*, 909 F.3d 1162, 1174 (D.C. Cir. 2018) (a declaration made "to the best of [the signer's] "knowledge and belief" "does not violate the law if [signer] reasonably believes in the reports' accuracy, even if the reports later prove inaccurate"). Thus, far from being "surplusage," Mem. 22, the Opinion Clause provides a degree of protection for applicants when their certifications turn out to be wrong.

Further, the Opinion Clause serves an important function in the broader Hatch-Waxman Act context. For instance, a certification under section 505(b)(2)(A)(iv) represents that a patent is invalid or will not be infringed and must "include a detailed statement of the factual and legal basis of the opinion." *See* 21 U.S.C. § 355(c)(3)(D)(ii). Such representations give the patent holder important information about whether to yield to the applicant's position or fight it in litigation. In litigation, moreover, courts often find the patent is valid and will be infringed. When that happens, it means that the certification was incorrect when made. In these circumstances, the statute's requirement that the certification be given only as a matter of "opinion" and "best knowledge" benefits the applicant by defining "an acceptable margin of error." *Muskin v. State Dep't of Assessments & Tax'n*, 30 A.3d 962, 975 (Md. 2011).

That language, however, does not alter FDA's obligation to review the whole of each application and reject those that contain objectively inaccurate certifications or statements. For instance, Avadel's attempt to coopt the Opinion Clause would preclude FDA from rejecting a certification under section 505(b)(2)(A)(i) incorrectly claiming that there are no patents in the *Orange Book* for the listed drug when such patents exist. Avadel's reading also would prevent FDA from rejecting a certification under section 505(b)(2)(A)(ii) that claims a patent has expired when in truth it still has life. Congress cannot have intended any of that.

Worse still, Avadel reads the Opinion Clause as modifying every bit of section 505(b)(2)(A) and section 505(b)(2)(B). Avadel contends that even their basic mandate ("shall also include") is a matter only of its subjective and dispositive opinion. *See, e.g.*, Mem. 22 (Congress deferred "to the 'opinion of the applicant' with respect to whether to submit a patent certification"); Mem. 20 (the Opinion Clause controls "the decision concerning which type of certification or statement to make"); ███████████████████████████████████████

23

███████████████████████████████████████████

███████████████████████

Avadel exaggerates the importance of its opinion. The Opinion Clause is not in subparagraph (B), which means Avadel's opinion has no bearing on the statements required by that separate provision. Even within subparagraph (A), the Opinion Clause has no bearing on the obligation to include a certification. That obligation is set out earlier by a verb phrase ("shall also include"), which is then modified by a subsequent, dependent adverbial clause ("with respect to each patent which claims the [listed drug] or which claims a use for such drug for which the applicant is seeking approval under this subsection…."). The adjectival Opinion Clause does not and cannot modify those parts of the statute. *Cf. Nielsen v. Preap*, 139 S. Ct. 954, 964 (2019) (adjectival clauses can only modify a noun, not a verb). In short, Avadel's opinion does not define its obligations under the statute. *City of Salisbury v. FERC*, 36 F.4th 1164 (D.C. Cir. 2022), is instructive. There, the plaintiff claimed the agency's decision was contrary to a condition imposed by the State of North Carolina. *See id.* at 1167-68. The plaintiff pointed to a dependent clause in the condition that incorporated its subjective view ("consistent with the City of Salisbury's design") and argued that the clause should be read to modify not just its antecedent, but also the rest of the provision. *See id.* at 1168. The D.C. Circuit found the plaintiff's assertion "untenable" and "not grammatically possible." *Id.* at 1168-69. The same is true here.[5]

---

[5] Avadel also errs in describing the Opinion Clause as "unique terminology not found elsewhere" in the FDCA. Mem. 22. 21 U.S.C. § 355(b)(3) is titled "Notice of opinion that patent is invalid or will not be infringed," and 21 U.S.C. § 355(b)(3)(D)(ii) requires such a notice to include "a detailed statement of the factual and legal basis of the opinion of the applicant that the patent is invalid or will not be infringed." Further, it is hardly unusual for submissions to the government to be qualified by similar language regarding the signer's knowledge and belief. For example, *Blanton*, 909 F.3d at 1174, concerned a requirement that bank officials attest that a report of the bank's financial condition "is true and correct to the best of his knowledge and belief" (quoting 12 U.S.C. § 161(a)). Similarly, the Federal Acquisition Regulations (FAR) require government

As a final sign that Avadel exaggerates its importance, it is worth noting that, since 2010, at least nine companies have filed abbreviated new drug applications ("ANDAs") for generic sodium oxybate. Each ANDA filer submitted a patent certification regarding the '963 patent. █████ ██ ███████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ It is not plausible that nine other companies all missed the fact that their subjective opinion could eliminate the obligation to certify. It is far more likely that Avadel is grasping at straws.

### d.      Avadel's Position Would Yield Absurd Results.

Avadel's argument would destroy the careful balance of incentives that Congress struck in the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 ("Hatch-Waxman Amendments"). Avadel asserts the Hatch-Waxman Amendments were intended solely to "speed the introduction" of follow-on drugs. Mem. 22. Not so. Actually, "Congress struck a balance between expediting generic drug applications and protecting the interests of the original drug manufacturers." *Abbott Lab'ys v. Young*, 920 F.2d 984, 985 (D.C. Cir. 1990).  The patent certification requirement is integral to that balance, "designed to protect the intellectual property rights of pioneer drug companies and others holding patents on brand name drugs."  *See aaiPharma Inc. v. Thompson*, 296 F.3d 227, 231 (4th Cir. 2002).

Avadel concedes that its position would eliminate patent certifications for virtually all method-of-use patents. Mem. 22-23. Every follow-on applicant would be able to submit an inaccurate section 505(b)(2)(B) statement, insist on its "opinion," and then force FDA to

_____

contractors to "certify that, to the best of my knowledge and belief," certain cost and pricing information submitted to the government is "accurate, complete, and current" as of a particular date.  FAR 15.406-02. These analogous "opinion clauses" obviously do not preclude government officials from scrutinizing the accuracy of the statements made.

immediately approve a follow-on drug for a protected use. Avadel rejoins that eroding the patent certification process is just a policy concern that should be left to Congress to fix, Mem. 23, but that is not correct. Avadel advocates that the usual rules of grammar and statutory construction should be set aside, and the overall statutory scheme ignored, so that its subjective opinion can control the obligations established by section 505(b)(2). That Avadel's reading also would obliterate a carefully drawn statutory balance that has been in effect for 38 years confirms that its argument cannot be correct. *See Epic Sys. Corp. v.* Lewis, 138 S. Ct. 1612, 1629 (2018) (courts must "preserve the balance Congress struck in its statutes").

Finally, Avadel suggests that the threat of a criminal probe is enough to protect the patent certification process. Mem. 22 (citing 18 U.S.C. § 1001(a)). There is, however, no evidence of FDA ever referring a section 505(b)(2)(B) statement to the Department of Justice, let alone evidence of a prosecution. Regardless, prosecution after the fact would not remedy an applicant's misuse of the FDCA's approval pathways. To address that problem, FDA must be able to reject inaccurate statements, as provided for in 21 U.S.C. § 355(d)(6), 21 U.S.C. § 355(e)(5), and 21 C.F.R. § 314.125(a)(7). FDA may have additional tools in its arsenal to enforce the integrity of its process, but that does not mean FDA cannot reject inaccurate statements.

### 2. The '963 Patent and Use Code 1110 Are Appropriately Included In The *Orange Book* And Cannot Be Challenged Here.

Avadel next argues that a certification was not required because neither the '963 patent nor Use Code 1110 should be in the *Orange Book*. Mem. 26-30.[6] These arguments lack merit.

---

[6] Avadel also feints at a challenge to FDA's decision to rely on Use Codes to review section 505(b)(2)(B) statements rather than interpret and construe the underlying patents. Mem. 24-25. Avadel concludes, however, that the issue "can be left for another day" and that the Court "need not decide whether FDA's sole reliance on a 'use code' is permissible." Mem. 25. Avadel fails to mention, however, that numerous courts have addressed that issue and confirmed that FDA's approach is appropriate. *See, e.g.*, *Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1349 (Fed. Cir. 2003); *aaiPharma Inc.*, 296 F.3d at 242–43; *Alphapharm Pty Ltd. v. Thompson*, 330 F. Supp. 2d 1, 6-9

### a.       The '963 Patent Is Appropriately Listed.

Until 2020, section 505(b)(1) and section 505(c)(2) required sponsors of innovative drugs to submit to FDA for inclusion in the *Orange Book* "any patent … which claims a method of using [the] drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(1) (2018); 21 U.S.C. § 355(c)(2) (2018). As amended by the Orange Book Transparency Act of 2020,[7] section 505(c)(2) now specifies that a method-of-use patent must "claim[] a method of use approved in the application" to be submitted for inclusion and provides that other patents "shall not be submitted." 21 U.S.C. § 355(c)(2). Invoking the amended statute, Avadel argues that patents describing REMS elements are ineligible for inclusion. Mem. 26-28. According to Avadel, the authority to require REMS elements is set out in section 505-1, which means that a REMS is not "approved" under section 505. *See* Mem. 27 ("a REMS is a set of restrictions imposed by FDA under a distinct section altogether").

Avadel misunderstands the relationship between section 505 and section 505-1. The latter authorizes FDA to require one or more REMS elements when the agency determines, during its review of an application, that a REMS "is necessary to ensure that the benefits of the drug outweigh [its] risks." 21 U.S.C. § 355-1(a)(1). More severe elements, such as the distribution requirements that Jazz created for XYREM, can only be included if the drug could not "be approved" without them. *Id.* § 355-1(f)(1)(A). When REMS elements have been determined to be necessary, the sponsor must submit a proposed REMS program "*as part of [its] application.*" *Id.* § 355-1(a)(1) (emphasis added). The proposed REMS elements are then reviewed by FDA and approved

(D.D.C. 2004). █████████████████████████████████████████████
████████████████████████████████████████████

[7] Pub. L. No. 116-290, § 2(b)(1), 134 Stat. 4889, 4890 (2021).

pursuant to section 505(c) and (d) as part of the drug's conditions of use. Indeed, Avadel concedes the point by admitting that it submitted its proposed REMS to FDA "[a]s part of this NDA application process." Mem. 11.

Citing materials from an unrelated litigation, Avadel claims that the elements of a REMS are not "conditions of use" approved pursuant to section 505(d). Mem. 28-29 (discussing *ViroPharma, Inc. v. Hamburg*, 916 F. Supp. 2d 76 (D.D.C. 2013)). Cherry-picked quotations aside,[8] *ViroPharma* involved an entirely different issue: 3-year market exclusivity for old antibiotics under 21 U.S.C. § 355(v)(3)(B). The district court determined that the plaintiff's minor labeling updates "pertained only to previously-approved conditions of use" and did not earn such exclusivity. *ViroPharma*, 916 F. Supp. 2d at 78. The court agreed with FDA that "labeling" and "conditions of use" are distinct but overlapping categories: a drug's approved "conditions of use" are the core aspects of FDA's approval, which are then "refined" and given "new details" by the product's approved "labeling." *Id.* at 80. *ViroPharma* thus stands for the proposition that a labeling change does not necessarily imply a change to the product's conditions of use.  No such issue is present in this case.

That said, an earlier decision in the *ViroPharma* litigation does have some relevance here. In an earlier opinion, the district court determined that the phrase "condition of use" in 21 U.S.C. § 355(v)(3)(B) is ambiguous for *Chevron* purposes and further ruled that FDA's reasonable interpretation of the phrase "condition of use" is entitled to deference. *See ViroPharma, Inc. v. Hamburg*, 898 F. Supp. 2d 1, 19-22 (D.D.C. 2012). ███████████████

---

[8] Avadel also insists that there is a broad recognition that REMS patents cannot trigger a patent certification. Mem. 3. In support of the alleged broad recognition, however, Avadel cites only an academic, a generic manufacturer, and an open docket. Mem. 26-27. One side of an ongoing policy debate is not "broad recognition" of anything and is certainly not legal authority.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████ *see also* Griffin Ex. 19 at 8 (assuming "arguendo" that the XYREM risk

management program materials constituted both labeling and conditions of use); Griffin Ex. 16

at 6 (*FDA RiskMAPs Guidance*) (a RiskMAP should include the "conditions of use most likely to

confer benefits and to minimize particular risks").

Avadel separately claims that the '963 patent cannot be listed in the *Orange Book* because

it allegedly offends 21 U.S.C. § 355-1(f)(8). Mem. 27-28. The history of section 505-1 actually

shows that Congress knew that elements to assure safe use could be patented. Although subsection

(f)(8) states that sponsors must not "use any element to assure safe use … to block or delay

approval" of a follow-on drug,[9] it neither amends nor repeals any of the provisions governing the

listing of patents in the *Orange Book*, the need to include patent certifications, or thirty-month

stays of approval. *Cf. Vill. of Barrington*, 636 F.3d at 662 ("Implied amendments are no more

favored than implied repeals.") (cleaned up). But a separate subsection did address how FDA

should approach patents covering REMS elements. Thus, the original subsection (i)(1)(B) stated

that a generic drug was presumptively subject to the same REMS elements as the listed drug. *See*

Pub. L. No. 110-85, tit. IX, subtit. A, § 901(b), 121 Stat. at 937. It allowed the generic "to use a

different, comparable" version if the element was "claimed by a patent that has not expired" and

the applicant "certifies that it has sought a license … and that it was unable to obtain a license."

---

[9] Enforcement of that prohibition was assigned to FDA as part of its unreviewable enforcement
discretion. *See* 21 U.S.C. §§ 355(p)(1), 331(d). As a private party, Avadel has no right to enforce
section 505-1(f)(8) itself or to complain that FDA failed to enforce section 505-1(f)(8) against
anyone else. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985).

121 Stat. at 937–38 (original section 505-1(i)(1)(B)(ii)). It also allowed FDA to "negotiate a voluntary agreement with the owner of the patent." *Id.* at 938. Although the statute has since been amended,[10] the original version shows that Congress never prohibited the inclusion of REMS-related patents in the *Orange Book*. Instead, Congress addressed any difficulties by giving FDA special authority and flexibility to find a solution and, as discussed below, by creating a special patent-litigation pathway to challenge *Orange Book* listings.

### b.    Use Code 1110 Is Appropriate.

Avadel next challenges Use Code 1110 as insufficiently specific for inclusion in the *Orange Book*. Mem. 29-30. Avadel faults U-1110 for referring to "a method of treating a patient with a prescription drug" rather than referring specifically to oxybate. But oxybate *is* a prescription drug, so the phrase "a prescription drug" applies equally to XYREM and FT218. Avadel cites no statute, regulation, or guidance holding that a Use Code for a method-of-use patent must describe the covered drug by nonproprietary name rather than a different descriptor.

The cases cited by Avadel, Mem. 30, are not on point because they each construe the actual patent rather than the corresponding Use Code. Although interpreting the '963 patent is the responsibility of the district court hearing the infringement case, ███████████████████ ████████████████████████████████████████████████ Thus, this is not the situation that the First Circuit confronted in *In re Lantus Direct Purchaser Antitrust Litigation*, where the patent mentioned only an older product and did not mention the approved drug "at any point." 950 F.3d 1, 6 (1st Cir. 2020).

Avadel's cases also are distinguishable because they deal with the listing of drug substance patents rather than the listing of method-of-use patents. In *Hoechst-Roussel Pharmaceuticals, Inc.*

---

[10] Pub. L. No. 116-94, Div. N., tit. I, subtit. F, § 610(f)(2), 133 Stat 2534, 3136 (2019).

*v. Lehman*, the Federal Circuit held that the plaintiff was not entitled to a patent term extension under 35 U.S.C. § 156(a) because the approved drug was metabolized in the body into a different chemical, and the patent in question only claimed the latter substance. 109 F.3d 756, 758-59 (Fed. Cir. 1997). Similarly, in *United Food & Commercial Workers Local 1776 & Participating Employers Health & Welfare Fund v. Takeda Pharmaceutical Co.*, the Second Circuit held that a patent that describes a combination product does not claim its component substances. 11 F. 4th 118, 132 (2d Cir. 2021). The court emphasized, however, that "the distinction between drug claims and method-of-use claims serves a central purpose in the regulatory scheme." *Id.* at 133. The court approved of broader latitude for listing method-of-use patents because the applicant can try to convince FDA that a section 505(b)(2)(B) statement is appropriate, *see id.* at 135, as Avadel tried to do here without success.

### c.    Avadel Cannot Challenge *Orange Book* Listings Here.

Even if there were some problem with the '963 patent or Use Code 1110, Avadel could not use this litigation to correct it. In *Apotex, Inc. v. Thompson*, a generic manufacturer sued FDA alleging that five patents were improperly listed in the *Orange Book* because they did "not claim [the listed drug] or a method of using [the listed drug] as approved in the original NDA." 347 F.3d 1335, 1340 (Fed. Cir. 2003). The district court dismissed because "there is no cause of action against the FDA to de-list a patent from the *Orange Book*." *Id.* at 1341. The Federal Circuit affirmed. *See id.* at 1349 ("the Act does not require [FDA] to police the listing process by analyzing whether the patents listed by NDA applicants actually claim the subject drugs or applicable methods of using those drugs."). *Watson Pharms., Inc. v. Henney*, 194 F. Supp. 2d 442, 445-46 (D. Md. 2001), is to the same effect.

Congress responded to those cases in 2003, but it did not amend the APA or otherwise authorize a suit against FDA to challenge a patent listing. Instead, Congress amended FDCA

section 505(c)(3)(D) to allow a section 505(b)(2) applicant that is sued for patent infringement based on a clause (iv) patent certification to "assert a counterclaim seeking an order requiring the holder to correct or delete" an *Orange Book* listing. 21 U.S.C. § 355(c)(3)(D)(ii)(I). As noted, Avadel has been pursuing such a counterclaim in the ongoing patent litigation since June 2021. *See supra* 11. And Congress was clear that a counterclaim in a patent infringement action is the **exclusive** judicial forum for an applicant's objection to the inclusion of a method-of-use patent in the *Orange Book*. *See* 21 U.S.C. § 355(c)(3)(D)(ii)(II) ("No independent cause of action.— Subclause (I) does not authorize the assertion of a claim described in subclause (I) in any civil action or proceeding other than a counterclaim described in subclause (I).").

Further, FDA regulations require that an appropriate patent certification or section 505(b)(2)(B) statement be maintained while an applicant pursues such a counterclaim. *See* 21 C.F.R. § 314.53(f)(1)(ii) ("A 505(b)(2) application … must contain an appropriate certification or statement for each listed patent, including the disputed patent, during and after the patent listing dispute."). FDA is thus doing exactly what its regulations require in light of the agency's determination that a section 505(b)(2)(B) statement is inappropriate. The patent court, not this Court, is the proper forum for Avadel's challenges to Jazz's patent or Use Code.

### 3. FDA Properly Reviewed Avadel's Proposed REMS To Assess The Accuracy Of Avadel's Statement.

Avadel claims that FDA erred by examining Avadel's proposed REMS to assess the accuracy of its statement. *See* Mem. 30-33. However, the statute required FDA to consider Avadel's entire application, including the proposed REMS. The obligation to submit a certification extends to every patent "which claims a use for [the listed drug] for which the applicant is seeking approval under this subsection," 21 U.S.C. § 355(b)(2)(A), while a section 505(b)(2)(B) statement is only permissible when a method-of-use patent "does not claim a use for which the applicant is

seeking approval under this subsection," *id.* § 355(b)(2)(B). The statute thus asks: *Does the applicant seek approval for a protected use?* That question can be answered meaningfully only if FDA reviews the full application, including any proposed REMS. *Cf.* 21 U.S.C. § 355-1(a)(1) (an applicant "shall submit" its proposed REMS "as part of such application").

To the extent FDA's regulations were read to limit the scope of its review to just a portion of the application, they would be invalid—a point Avadel makes twice. Mem. 21 n.11 ("an agency regulation cannot be applied when it conflicts with the statute"); Mem. 28 (a regulation in conflict with a statute "could not be applied"). At least on the facts presented here, however, there is no daylight between FDA's regulations and the inquiry demanded by the statute. Avadel agrees that FDA was required by regulation to review all of Avadel's proposed "labeling." Mem. 30-31 (quoting 21 C.F.R. § 314.50(i)(1)(iii)(A)-(B)). Avadel's proposed REMS was indisputably part of the proposed labeling for FT218.

Avadel sheepishly acknowledges that are "instances in the record in which Avadel suggested that a REMS might form part of a product's labeling." Mem. 32 n. 16. In fact, there are *many* such instances and there are *zero* instances in which Avadel contended otherwise. Thus,

[REDACTED]

[REDACTED]

In any event, drug labeling includes any "written, printed, or graphic matter accompanying such article" in interstate commerce. 21 U.S.C. § 321(m)(2); *see* 21 C.F.R. § 1.3(a) ("all written, printed, or graphic matter … accompanying an article at any time while such article is in interstate commerce"). Avadel now claims that REMS materials cannot be labeling because they do not accompany the drug, Mem 32, but it ignores that the Supreme Court long ago interpreted the phrase "accompanying such article" to include any written materials that explain the drug as part "of an integrated distribution program." *Kordel v. United States*, 335 U.S. 345, 350 (1948); *see id.* ("One article or thing is accompanied by another when it supplements or explains it, in the manner that a committee report of the Congress accompanies a bill."); *United States v. Urbuteit*, 335 U.S. 355, 357 (1948) (labeling must be judged by "functional standards"); *see also United States v. Urbuteit*, 336 U.S. 804, 805 (1949) (per curiam) ("Since the function of the leaflets and the purpose of their shipment were established, nothing more was needed….").

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

All of these materials are labeling. They all have an obvious "textual relationship" with the drug they describe. *Kordel*, 335 U.S. at 350. They will be distributed by Avadel to providers, pharmacists, and patients through an "integrated distribution program." *Id.*; *see United States v.*

*Alberty Food Prods.*, 98 F. Supp. 23, 27 (S.D. Cal. 1951) (labeling is part of an integrated distribution program when it "has the same destination as the drug and hence will likely reach the hands of the consumer"). They also have the "the function" of labeling, *Urbuteit*, 336 U.S. at 805, because they describe the restricted distribution program that FDA found necessary to ensure the safe use of a dangerous CNS depressant that is otherwise a Schedule I controlled substance associated with sexual assault. *See United States v. 24 Bottles Sterling Vinegar & Honey*, 338 F.2d 157, 158-59 (2d Cir. 1964) (labeling is defined "in terms of the function served by the writing"); *United States v. 24 Devices*, 202 F. Supp. 147, 148 (D.N.J. 1962) (writings were "labeling" where they "explain the functions of the device").

Because the regulations that describe how FDA will review a section 505(b)(2)(B) statement use the term "labeling," 21 C.F.R. § 314.50(i)(1)(iii)(A)-(B), it was appropriate for FDA to review Avadel's proposed REMS and natural for Avadel to concede, at the time, that its REMS is "labeling."  In now grasping for the opposite position, Avadel confuses the issue by conflating "labeling" with the phrase "'prescribing information.'" *See* Mem. 31 (quoting Divis Decl. Ex. 15 at 11-12). "Labeling" and "prescribing information" are not synonyms, and it is misleading for Avadel to suggest that they are.[11] When FDA's regulations limit a rule to just the drug's

---

[11] A drug's "prescribing information" is a particular type of "labeling" and, specifically, the document required by 21 U.S.C. § 352(f)(1) and 21 C.F.R. § 201.100(c)(1). It is distributed "on or within the package from which the drug is to be dispensed" and provides "adequate information" describing the conditions of use "under which practitioners licensed by law to administer the drug can use the drug safely and for the purposes for which it is intended." 21 C.F.R. § 201.100(c)(1). It is formatted per the Physician Labeling Rule. *Id.* § 201.100(d)(3) (citing *id.* §§ 201.56 and 201.57). Thus, "prescribing information," "package insert," "physician labeling," and "professional labeling" are all synonyms that refer to the same document. In this case, █████

████████████████████████████████████████████ There are, of course, other types of "labeling." For instance, some drugs are marketed with a document called "Instructions for Use." ███████████
████████████████ When a drug presents serious risks, FDA often requires "patient labeling," also known as a "patient package insert" or a "Medication Guide." 21 U.S.C. § 355-1(e)(2); 21 C.F.R.

prescribing information, they do so expressly. *See, e.g.*, 21 C.F.R. § 314.50(*l*)(1)(i) (requiring the submission of "labeling required under § 201.100(d)(3) of this chapter (commonly referred to as the package insert or professional labeling)").

Avadel also collects sources that describe REMS as being beyond a drug's "approved labeling," Mem. 31-32, and sources that conflate "label" and "labeling," Mem. 24, 33. These are all misstatements. A more accurate statement would be that REMS impose restrictions "beyond the drug's ***professional labeling***." GAO, *Generic Drug Development: Stakeholders' Views of Risk Evaluation and Mitigation Strategies Differ*, GAO-20-94, at 6 (Oct. 2019) (emphasis added); *accord* Griffin Ex. 35 at 4 (*FDA REMS Integration Initiative*); *Mylan Pharms. v. Celgene Corp.*, No. 14-2094, 2018 U.S. Dist. LEXIS 242826, at *7 (D.N.J. Oct. 3, 2018); *Wisconsin v. Indivior Inc.*, No. 2445, 2017 U.S. Dist. LEXIS 179101, at *15 n.6 (E.D. Pa. Oct. 30, 2017). In other words, a REMS is different from a drug's package insert, but it remains part of the drug's labeling all the same.

Moreover, even the alleged line between REMS and professional labeling is overstated. Professional labeling generally discloses the existence of any applicable REMS, describes its basic requirements, and refers readers to the REMS materials for more information. ████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

---

§ 208.1(c). ████████████████████████████████  When FDA determines that a drug could not otherwise be approved, the agency requires additional labeling in the form of REMS elements. ████████████████████████████

███████████████████████   Avadel's belated argument that REMS are not labeling is, to the extent not waived, simply meritless.

### 4. FDA Reasonably Determined That Avadel's Proposed REMS Would Tread On The Use Code.

Avadel argues that its REMS document does not overlap with U-1110's description of the '963 patent because Avadel's REMS document does not contain any reference to any "method of treating a patient with a prescription drug using a computer database in a computer system for distribution," as described in U-1110. Mem. 33 n.17 (*comparing* Ex. 2 to Divis Decl., LUMRYZ REMS Document at 1-10, *with* Ex. 6 to Divis Decl., U-1110 at 1; *cf.* Ex. 7 to Divis Decl., '963 patent at 1-30). Avadel says the difference is that its REMS supposedly "describes the use of four distinct databases," Mem. 33, whereas Jazz's use code, U-1110, supposedly "refers to the use [of] a single computer database in a single computer system to accomplish drug distribution." Mem. 34; *see also id.* (contending that "U-1110 covers only the use of '*a*' single computer database in '*a*' single, centralized 'computer system' for distribution").

Avadel's argument ignores authorities holding that the indefinite article "a" ordinarily encompasses multiples of a term. For instance, the Dictionary Act explains that in federal statutes, "words importing the singular"—*e.g.*, "a" or "an"— ordinarily "include and apply to several persons, parties, or things," unless context indicates otherwise. 1 U.S.C. § 1. The D.C. Circuit agrees: "'A' means one or any ... and is not necessarily a singular term; it is more often used in the sense of 'any' and is then applied to more than one individual object." *Citizens for Resp. & Ethics in Washington v. FEC*, 971 F.3d 340, 354–55 (D.C. Cir. 2020) (cleaned up; quoting Black's Law Dictionary (5th ed. 1979) and other leading dictionaries).

Cases construing patents likewise hold that in general, the words "a" or "an" in a patent claim mean "one or more." *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342–43

(Fed. Cir. 2008). Exceptions "are extremely limited: a patentee must 'evince[] a clear intent' to limit 'a' or 'an' to 'one.'" *Id.* at 1342 (quoting *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000). Avadel identifies no such evidence here.[12]

Against all of that, Avadel contends that the Supreme Court's decision in *Niz-Chavez v. Garland*, 141 S. Ct. 1474 (2021), broadly held that "the article 'a' … refers to a 'single' item." Mem. 34 (citing *Niz-Chavez*, 141 S. Ct. at 1480). But *Niz-Chavez* was a narrow, case-specific decision.  It engaged with a "long parade of textual and contextual clues" to find that an immigration statute's reference to "a notice to appear" necessarily required the government to provide all of the information needed to initiate a legal proceeding in a single document. 141 S. Ct. at 1484–85. Far from suggesting that the indefinite article always refers to a single item, *Niz-Chavez* confirms that the indefinite article "a" often refers to multiple items, including through this colorful illustration:  if "a statute made it a crime to vandalize 'a' bank . . . someone who vandalizes five banks could not avoid prosecution on the ground that he vandalized more than one." *Id.* at 1482. That reasoning firmly supports FDA's conclusion here.  U-1110 covers the use of "a computer database." Avadel cannot evade its reach by claiming its REMS uses four computer databases rather than just one.[13]

---

[12] This case does not provide occasion for this Court to construe the patent itself—that issue is for the court hearing the patent litigation. But because a use code is a sponsor's shorthand for a patent's claims, it makes sense to consider the rules of construction that apply to patents.

[13] After *Niz-Chavez*, the United States District Court for the Eastern District of Texas considered whether a patent's reference to "a database" means "one or more electronic databases." *Island Intell. Prop., LLC v. TD Ameritrade, Inc.*, No. 2:21-CV-00273-JRG, 2022 WL 1608044, at *8 (E.D. Tex. May 20, 2022).  That court concluded that a patent's reference to "a database" meant "one or more databases" because the claims, specifications, and prosecution history did not "necessitate a departure from the general rule that 'a' or 'an' can mean 'one or more.'" *Id.*

**5.      FDA Did Not Unlawfully Withhold or Unreasonably Delay Any Action Owed To Avadel.**

The APA allows a court to "compel agency action unlawfully withheld or unreasonably delayed," but that "extraordinary relief" is available only where an agency "failed to take a *discrete* agency action that it is *required to take.*" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Here we have the polar opposite situation. Avadel concedes that by filing the paragraph (iv) certification, it triggered a statutory stay that "now precludes the immediate approval of the [FT218] NDA." Compl. ¶ 97. In other words, the law actually *precludes* FDA from doing what Avadel would have this Court compel.

Avadel's topsy-turvy request flows from its misreading of the statute. It argues that section 505(c)(1) of the FDCA flatly requires FDA to adjudicate every new drug application within 180 days of filing. In Avadel's view, the only exception to that "binding and judicially enforceable" timeline comes when the applicant agrees to extend the deadline.  Mem. 42.

Avadel badly errs. As things currently stand, the 180-day deadline in section 505(c)(1) does not govern Avadel's application. That provision governs only where an application under subsection (b) contains no patent certification at all (which is true of all (b)(1) applications and a small minority of (b)(2) applications). ███████████████████████████

████████████████████████████████████████████████

██████████████████  As a result, the timing of action on Avadel's application is and always has been controlled by section 505(c)(3). *See* 21 U.S.C. § 355(c)(3); *see also Genus Lifesciences, Inc. v. Azar*, 486 F. Supp. 3d 450, 462 (D.D.C. 2020) ("FDA should refer to the subsequent 505(b)(2) application's patent certification to determine the timeline for approval of that application"). Under the timelines specified in section 505(c)(3), FDA is legally prohibited from approving Avadel's application until next year. Count II thus assumes a win on the merits of

Count I—the only way there could even theoretically be a timing problem is if the underlying Patent Decision were first held unlawful and set aside. But Count II also assumes a win on issues that are yet to be resolved, including the unresolved ODE question arising from FDA's determination that XYWAV is the clinically superior product.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ Publicly, Avadel celebrated. *See supra* 11. But just three days later, Avadel turned around and sued, contending that the TA letter it had just requested was, in fact, statutorily deficient because it is not a final approval.  Compl. ¶ 134.

The above facts sharply distinguish this case from *Sandoz, Inc. v. Leavitt*, 427 F. Supp. 2d 29, 34 (D.D.C. 2006). *Sandoz* featured a period of delay on approval that was "nearing 1000-day[s]," *id.* at 40, and more than one year had elapsed between the time of the agency's final communication to the applicant and the filing of the lawsuit, *see id.* at 32 (identifying a final agency communication in August 2004 and suit filed in September 2005). Further, FDA had never provided a substantive explanation for the delay. █████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████ So unlike the plaintiff in *Sandoz*, Avadel has no case that FDA was sitting on its hands. FDA acted—just not the way Avadel wanted.

A final factor sharply distinguishes this case from *Sandoz*—the Covid-19 pandemic. Understandably, FDA focused its limited resources on meeting the demands of the pandemic, including by channeling extra resources toward applications for Covid-related drugs. *See* Griffin Ex. 26 at 79 (*FDA FY2021 PDUFA Report*). So while Avadel emphasizes certain drug applications have been approved in recent years, including some on or before their PDUFA dates, Avadel's argument misses the forest for the trees: *Many* drug applications have experienced delays while Avadel's FT218 application has been pending.

The same facts inform the weighing of the six traditional *TRAC* factors.  *See TRAC*, 750 F.2d at 80 (cleaned up). Most importantly, the first factor teaches that the court's analysis is flexible and governed by a case-specific "rule of reason."  FDA's actions in responding to Avadel's application were reasonably timely, all things (including Covid) considered. Moreover, as things now stand, FDA *may not* issue the final approval that Avadel seeks, because Avadel chose to respond to the Patent Decision by submitting a paragraph (iv) certification and thereby triggered a statutory stay of approval.

The second factor (Congressional timelines) also supports Defendants. Section 505(c)(3) shows Congress wanted FDA's final approval decisions generally to wait on the patent court's determinations.  Avadel's request for expedition disregards that scheme.

The remaining *TRAC* factors essentially run together in this case.  Avadel seeks to invoke the interests of narcolepsy patients, arguing that expanding the number of treatment options available to those patients would be good for them (and, not coincidentally, good for Avadel's commercial interests). But to serve that relatively narrow set of interests, Avadel asks this Court to disregard all others. A ruling in Avadel's favor would unsettle FDA's established rules surrounding the drug approval process, including the rules established to protect federal patent

rights. Such a ruling would have disruptive effects on patients and companies with interests across the drug innovation landscape. The Court should firmly decline Avadel's invitation.

## II.    AVADEL HAS NOT DEMONSTRATED A BASIS FOR INJUNCTIVE RELIEF.

Avadel has not come close to carrying its heavy burden to show that the traditional preliminary-injunction factors weigh in favor of injunctive relief. *See Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009). Avadel cannot show likely success because its case fails for lack of jurisdiction, lack of a cause of action, and on the merits too. Hence, "there is no need to consider the remaining factors." *Greater New Orleans Fair Hous. Action Ctr. v. Dep't of Hous. & Urb. Dev.*, 639 F.3d 1078, 1088 (D.C. Cir. 2011).

Avadel's irreparable injury claim also fails. To show irreparable harm, Avadel must show that it faces a "certain and great" injury that is "actual and not theoretical," and "of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 46 (D.D.C. 2014) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Avadel has publicly assured investors that it can afford to wait.  *See e.g.*, Griffin Ex. 36 at 3 (*June 2022 Corporate Update*) (describing "cost reduction actions … to ensure the company is in the financial position to bridge from today until [mid-2023] and the potential final approval of FT218").

Moreover, Avadel must show that any irreparable harm "will directly result from the action which [it] seeks to enjoin." *Id.* (quoting *Wis. Gas*, 758 F.2d at 674). For at least two reasons, Avadel cannot show causation. ███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████

Second, Avadel's asserted injuries are traceable to Avadel's aggressive and ill-considered regulatory strategy rather than FDA's challenged actions. As discussed above, Avadel chose to focus its corporate strategy solely on the launch of FT218 by divesting all of its revenue generating assets, knowing full well when it did that its regulatory strategy of refusing to certify to Jazz's patent could go bust. Avadel ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

The balance of equities also tilts firmly in FDA's and Jazz's favor. When weighing the equities, courts assess whether the alleged harms were "self-inflicted." *Par Pharms., Inc. v. TWI Pharms., Inc.*, No. CIV. CCB-11-2466, 2014 WL 3956024, at *5 (D. Md. Aug. 12, 2014); *see also Sanofi–Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006) (rejecting hardship claim where generic challenger's "harms were almost entirely preventable and were the result of its own calculated risk to launch its product prejudgment") (quotation marks omitted). Here, Avadel decided to divest and became entirely reliant on an aggressive filing strategy that failed to secure approval for its only asset. Choices should, and sometimes do, have consequences.

As for the public interest, the consistent and accurate application of federal safety laws and regulations always serve the public. *See LG Elecs. U.S.A., Inc. v. Dep't of Energy*, 679 F. Supp. 2d 18, 37 (D.D.C. 2010). FDA appropriately followed the law when it issued the Patent Decision and, given Avadel's decision to certify and trigger patent litigation, it is currently powerless to issue a final approval. It would be contrary to the public interest to undermine that determination. Avadel's attempt to show that an injunction would serve the interest of narcolepsy patients lacks merit. As noted above, there are multiple treatment options for narcolepsy beyond Xyrem and Xywax. FT218 would be joining the ranks of these treatments, not expanding from a field of two. Nor is Avadel planning to offer FT218 at a lower price point; it has told investors that it will likely price FT218 "in the area of where current oxybate treatments are currently priced." Ex. 27 at 12.

## CONCLUSION

The Court should deny Avadel's motions for summary judgment and for a preliminary injunction, and should grant FDA and Jazz's motions for summary judgment.

Dated: August 19, 2022

Respectfully submitted,

/s/ Kwaku A. Akowuah
Kwaku A. Akowuah (D.C. Bar No. 992575)
Sean C. Griffin (D.C. Bar No. 499537)
Christopher S. Ross (D.C. Bar No. 1643856)
SIDLEY AUSTIN LLP
1501 K Street N.W.
Washington, DC 20005
T: (202) 736-8000
F: (202) 736-8711
kakowuah@sidley.com
sgriffin@sidley.com
christopher.ross@sidley.com

*Counsel for Defendant-Intervenor Jazz Pharmaceuticals, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 19, 2022, I electronically filed the foregoing Cross-Motion for Summary Judgment and accompanying documents under seal with the Clerk of the Court of the U.S. District Court for the District of Columbia by using the Court's CM/ECF system. Consistent with the terms of the Stipulated Protective Order entered in this case on August 4, 2022, all participants will be served with the Notice of Electronic Filing and the foregoing Cross-Motion for Summary Judgment via email.

Date: August 19, 2022                                                    /s/ Kwaku A. Akowuah
                                                                          Kwaku A. Akowuah