**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AVADEL CNS PHARMACEUTICALS, LLC<br><br>       Plaintiff,<br><br>  v.<br><br>XAVIER BECERRA, Secretary of Health and Human Services<br><br>U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES<br><br>ROBERT M. CALIFF, Commissioner of Food and Drugs<br><br>U.S. FOOD AND DRUG ADMINISTRATION<br><br>       Defendants,<br><br>and<br><br>JAZZ PHARMACEUTICALS, INC.<br><br>       Defendant-Intervenor. | Case No. 1:22-cv-02159-APM<br><br>**FILED UNDER SEAL**<br><br>**ORAL ARGUMENT REQUESTED** |

**COMBINED MEMORANDUM OF POINTS AND AUTHORITIES IN REPLY TO
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION OR IN THE
ALTERNATIVE SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS'
AND DEFENDANT-INTERVENOR'S MOTION FOR SUMMARY JUDGMENT**

TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

ARGUMENT .........................................................................................................5

I.      JAZZ'S REVIEWABILITY CHALLENGES ALL FAIL .....................7

        A.      Congress Has Not Stripped This Court's Jurisdiction .................7

        B.      The Patent Decision Is Final Agency Action Reviewable under the
                APA......................................................................................................11

II.     AVADEL'S CHALLENGE TO THE PATENT DECISION SUCCEEDS .........15

        A.      FDA Lacks Authority To Second Guess an Applicants' Opinion
                That a Patent Certification Is Inappropriate...............................15

                1.      Avadel did not waive its challenge to FDA's lack of
                        statutory authority .........................................................15

                2.      FDA lacks statutory authority to police patent certifications
                        and statements ................................................................18

        B.      The LUMRYZ NDA Does Not Seek Approval of a "Use For"
                Sodium Oxybate, Nor a "Condition of Use," Claimed by U-1110............25

                1.      *U-1110 does not describe a use for "such drug"* .............25

                        a.      U-1110 does not describe a use for *any* drug............25

                        b.      U-1110 does not describe a use for *sodium
                                oxybate* ....................................................................30

                        c.      Jazz's other arguments are misdirected ...................31

                2.      *Avadel's LUMRYZ REMS does not seek approval
                        under 21 U.S.C. § 355(b) for a use for a drug*.................33

        C.      FDA Violated Its Own Regulations by Referring To LUMRYZ
                REMS Information beyond the LUMRYZ Labeling...............................35

        D.      U-1110 Does Not Describe a Use Of Sodium Oxybate For Which
                Avadel Seeks Approval in the LUMRYZ NDA. ......................................37

II.     DEFENDANTS SHOULD BE ORDERED TO FULLY ADJUDICATE
        THE LUMRYZ NDA WITHIN FOURTEEN DAYS OF THIS COURT'S
        ORDER ...................................................................................................40

III.    ALL EQUITABLE FACTORS SUPPORT IMMEDIATE RELIEF ...................42

        A.      Avadel Will Suffer Irreparable Harm Absent Immediate Relief...............42

        B.      The Balance Of Equities And Public Interest Favor Immediate
                Relief....................................................................................................45

CONCLUSION....................................................................................................45

## **TABLE OF AUTHORITIES**

**Page(s)**

### CASES

*aaiPharma Inc. v. Thompson*,
   296 F.3d 227 (4th Cir. 2002) .......................................................................14

*Allergan, Inc. v. Alcon Labs., Inc.*,
   200 F. Supp. 2d 1219 (C.D. Cal. 2002) .....................................................26

*Am. Coll. of Obstetricians & Gynecologists v. FDA*,
   472 F. Supp. 3d 183 (D. Md. 2020) ............................................................36

*Am. Trucking Ass'ns v. Reich*,
   955 F. Supp. 4 (D.D.C. 1997) ....................................................................13

*Apotex Inc. v. FDA*,
   414 F. Supp. 2d 61 (D.D.C. 2006), *aff'd*, 226 F. App'x 4 (D.C. Cir. 2007) .................8

*Apotex, Inc. v. Thompson*,
   347 F.3d 1335 (Fed. Cir. 2003) ..................................................................14

*Barr Lab'ys, Inc. v. Thompson*,
   238 F. Supp. 2d 236 (D.D.C. 2002) .............................................................9

*Bell Helicopter Textron, Inc. v. Airbus Helicopters*,
   78 F. Supp. 3d 253 (D.D.C. 2015) ..............................................................43

*Bennett v. Spear*,
   520 U.S. 154 (1997) ............................................................................11, 12

*Caraco Pharmaceutical Laboratories, Ltd. v. Novo Nordisk A/S*,
   566 U.S. 399 (2012) ............................................................................31, 32

*Carr v. Saul*,
   141 S. Ct. 1352 (2021) ........................................................................16, 17

*Church of Scientology of Cal. v. United States*,
   506 U.S. 9 (1992) ...................................................................................13

*Cigar Ass'n of Am. v. FDA*,
   317 F. Supp. 3d 555 (D.D.C. 2018) .............................................................43

*City of Salisbury v. FERC*,
   36 F.4th 1164 (D.C. Cir. 2022) .................................................................20

*Confederated Tribes of the Chehalis Rsrv. v. Mnuchin,*
   456 F. Supp. 3d 152 (D.D.C. 2020) ...................................................................43

*Cutler v. Hayes,*
   818 F.2d 879 (D.C. Cir. 1987) .........................................................................10

*District of Columbia v. U.S. Dep't of Agric.,*
   444 F. Supp. 3d 1 (D.D.C. 2020) .....................................................................43

*Dr. Reddy's Laboratories, Inc. v. Thompson,*
   302 F. Supp. 2d 340 (D.N.J. 2003) ..................................................................24

*Eagle Pharms., Inc. v. Azar,*
   No. 16-790, 2018 WL 3838265 (D.D.C. June 8, 2018) ...................................24

*Filazapovich v. Dep't of State,*
   560 F. Supp. 3d 203 (D.D.C. 2021) .................................................................44

*FirstHealth Moore Reg'l Hosp. v. Becerra,*
   560 F. Supp. 3d 295 (D.D.C. 2021) .................................................................17

*Genus Lifesciences, Inc. v. Azar,*
   486 F. Supp. 3d 450 (D.D.C. 2020) .................................................................21

*Genus Lifesciences, Inc. v. Azar,*
   No. 20-211, 2021 WL 270409 (D.D.C. Jan. 27, 2021) ....................................22

*Grecian Magnesite Mining, Indus. & Shipping Co., SA v. Comm'r of IRS,*
   926 F.3d 819 (D.C. Cir. 2019) .........................................................................20

*Her Majesty the Queen v. EPA,*
   912 F.2d 1525 (D.C. Cir. 1990) .......................................................................12

*Int'l Long Term Care, Inc. v. Shalala,*
   947 F. Supp. 15 (D.D.C. 1996) ........................................................................44

*Island Intell. Prop., LLC v. TD Ameritrade, Inc.,*
   No. 21-273, 2022 WL 1608044 (E.D. Tex. May 20, 2022) ..............................39

*Jason v. Summerfield,*
   214 F.2d 273 (D.C. Cir. 1954) .........................................................................36

*Jones v. United States,*
   527 U.S. 373 (1999) .........................................................................................27

*Kordel v. United States,*
   335 U.S. 345 (1948) .........................................................................................36

*In re Lantus Direct Purchaser Antitrust Litigation*
    950 F.3d 1 (1st Cir. 2020) ................................................... 31

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) .................................................. 45

*Maupin v. Azar*,
    424 F. Supp. 3d 830 (C.D. Cal. 2019) ..................................... 18

*McCarthy v. Madigan*,
    503 U.S. 140 (1992) ........................................................... 35

*Merck & Co. v. HHS*,
    385 F. Supp. 3d 81 (D.D.C. 2019) ......................................... 23

*Micei Int'l v. Dep't of Com.*,
    613 F.3d 1147 (D.C. Cir. 2010) .............................................. 7

*Moms Against Mercury v. FDA*,
    483 F.3d 824 (D.C. Cir. 2007) .............................................. 10

*MVMA v. State Farm Mut. Auto Ins. Co.*,
    463 U.S. 29 (1983) ........................................................ 25, 27

*Mylan Pharms., Inc. v. Sebelius*,
    856 F. Supp. 2d 196 (D.D.C. 2012) .......................................... 8

*NACAA v. EPA*,
    489 F.3d 1221 (D.C. Cir. 2007) ............................................. 25

*Nalco Co. v. EPA*,
    786 F. Supp. 2d 177 (D.D.C. 2011) ........................................ 43

*Nat'l Envtl. Dev. Ass'ns Clean Air Project v. EPA*,
    752 F.3d 999 (D.C. Cir. 2014) .......................................... 12, 36

*Nat'l Treasury Emples. Union v. FLRA*,
    745 F.3d 1219 (D.C. Cir. 2014) ............................................ 13

*Niz-Chavez v. Garland*,
    141 S. Ct. 1474 (2021) ...................................................... 39

*Nken v. Holder*,
    556 U.S. 418 (2009) .......................................................... 45

*Nostrum Pharmaceuticals, LLC v. FDA*,
    35 F.4th 820 (D.C. Cir. 2022) ........................................... 8, 13

iv

*In re NRDC*,
　　645 F.3d 400 (D.C. Cir. 2011) ................................................................................10

*O'Donnell Constr. Co. v. District of Columbia*,
　　963 F.2d 420 (D.C. Cir. 1992) ................................................................................43

*Otsuka Pharm. Co., Ltd. v. Torrent Pharm. Ltd., Inc.*,
　　99 F. Supp. 3d 461 (D.N.J. 2015) ...........................................................................45

*Pennaco Energy, Inc. v. DOI*,
　　377 F.3d 1147 (10th Cir. 2004) ..............................................................................12

*Purepac Pharm. Co. v. Friedman*,
　　No. 1:98-cv-01780-RCL (D.D.C. 1998), *aff'd*, 162 F.3d 1201 (D.C. Cir. 1998)..........8

*Purepac Pharm. Co. v. Thompson*,
　　238 F. Supp. 2d 191 (D.D.C. 2002), *aff'd*, 354 F.3d 877 (D.C. Cir. 2004)......... *passim*

*Ramirez v. USCIS*,
　　310 F. Supp. 3d 7 (D.D.C. 2018) ............................................................................15

*Ranbaxy Labs. Ltd. v. FDA*,
　　307 F. Supp. 2d 15 (D.D.C. 2004), *aff'd*, 96 F. App'x 1 (D.C. Cir. 2004)....................9

*Ross v. Blake*,
　　578 U.S. 632 (2016).................................................................................................26

*S.F. Herring Ass'n v. Dep't of the Interior*,
　　946 F.3d 564 (9th Cir. 2019) ..................................................................................14

*Sackett v. EPA*,
　　566 U.S. 120 (2012).......................................................................................11, 12, 14

*Sandoz, Inc. v. Leavitt*,
　　427 F. Supp. 2d 29 (D.D.C. 2006) ....................................................................11, 42

*SEC v. Chenery Corp.*,
　　318 U.S. 80 (1943)...................................................................................................29

*Takeda v. Zydus*,
　　No. 18-1994 (D. N.J. Feb. 24, 2021), Dkt. 152-1 ......................................................14

*Teva Pharm., USA, Inc. v. FDA*,
　　No. 1:99-cv-00067-CKK (D.D.C. 1999) ...................................................................8

*Teva Pharm. USA, Inc. v. Sebelius*,
　　638 F. Supp. 2d 42 (D.D.C. 2009) ............................................................................8

*Torpharm, Inc. v. Shalala*,
   No. 97-1925, 1997 WL 33472411 (D.D.C. Sept. 15, 1997) .........................................10

*TorPharm, Inc. v. Thompson*,
   260 F. Supp. 2d 69 (D.D.C. 2003), *aff'd*, *Purepac*, 354 F.3d 877 ...............................9

*TRAC v. FCC*,
   750 F.2d 70 (D.C. Cir. 1984) ...................................................................................9

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001) ..................................................................................................22

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
   578 U.S. 590 (2016) ................................................................................................14

*UFCW Local 1776 v. Takeda Pharma. Co. Ltd.*,
   11 F.4th 118 (2d Cir. 2021) .....................................................................................30

*United States v. Chrysler Corp.*,
   158 F.3d 1350 (D.C. Cir. 1998) ...............................................................................13

*United States v. Laraneta*,
   700 F.3d 983 (7th Cir. 2012) ...................................................................................20

*Veloxis Pharms., Inc. v. U.S. FDA*,
   109 F. Supp. 3d 104 (D.D.C. 2015) ...........................................................................9

*Walters v. Metro. Educ. Enters., Inc.*,
   519 U.S. 202 (1997) ................................................................................................26

*Weinberger v. Bentex Pharmaceuticals, Inc.*,
   412 U.S. 645 (1973) ................................................................................................10

*White v. United States*,
   543 F.3d 1330 (Fed. Cir. 2008) ...............................................................................18

*Wilson v. Frito-Lay N. Am., Inc.*,
   No. 12-1586 SC, 2013 WL 1320468 (N.D. Cal. Apr. 1, 2013) ................................37

## STATUTES

5 U.S.C.
   § 704 ......................................................................................................................14
   § 706(1) ...........................................................................................................11, 41

18 U.S.C. § 1001(a) ...........................................................................................................25

21 U.S.C.
    § 321(m) ................................................................................................36
    § 355-1 ...........................................................................................33. 36
    *§* 355 ...........................................................................................*passim*
    § 360cc ..........................................................................................41, 44
    § 393 ..................................................................................................23

28 U.S.C.
    § 1331 ..................................................................................................7
    § 2342(1) .............................................................................................9

47 U.S.C. § 402(a) ....................................................................................9

## REGULATIONS

21 C.F.R.
    § 10.85 ...............................................................................................18
    § 314.50 ...............................................3, 17, 18, 21, 26, 35, 37, 38
    § 314.53 ...............................................................................................39

## FEDERAL REGISTER NOTICES

68 Fed. Reg. 36676 (2003) ....................................................18, 19, 25, 39

80 Fed. Reg. 6,802 (2015) ......................................................................21

81 Fed. Reg. 69580 (2016) .............................................................18, 21, 27

**INTRODUCTION**

At this point in the briefing of this case, a dose of reality is helpful.  Sodium oxybate, the active ingredient in both Plaintiff Avadel's and Defendant-Intervenor Jazz's narcolepsy drugs, is a scheduled controlled substance.  If not carefully controlled, it can get into the hands of non-patients for whom the drugs are not prescribed, and it has been associated with date rape and other abuse.  For that reason, specialized Risk Evaluation and Mitigation Strategies ("REMS") are needed to prevent diversion of oxybate drugs from the distribution chain for narcolepsy patients.

The specific Jazz patent at the core of this case, as described in "use code" U-1110, does not address how Jazz's drug is to be used by any patient diagnosed with narcolepsy.  It instead addresses a specific process to limit *distribution* of the drug, in order to prevent *non-patients* from obtaining it.  When Congress enacted the FDCA's patent certification provisions in Section 505(b)(2), it focused the obligation to certify on patents that claim either "the drug" itself or a "use" for that drug.  Nothing in Section 505(b)(2) focuses on the controlled distribution systems that may be necessary to prevent diversion of a drug.  Indeed, when Congress later addressed such drug distribution and related safety measures in Section 505-1 in 2007, it specifically provided that such anti-diversion and safety measures should *not* be used to delay the approval of NDAs under Section 505(b)(2).  *See* Food and Drug Administration Amendments Act of 2007, Pub. L. No. 110-85, 121 Stat. 823, 932 (codified at 21 U.S.C. § 355-1(f)(8)).  And yet, the thrust of both Jazz's and Federal Defendants' briefs in this case is that Jazz and FDA should be permitted to do exactly what Congress prohibited in 505-1(f)(8)—delay approval of Avadel's 505(b)(2) drug by interpreting the certification provisions in 505(b)(2)(A) to cover a "use code" solely addressing drug distribution.

████████████████████████████████████

██████████  Jazz has maintained a monopoly on oxybate drugs for 20 years and has repeatedly

1

sought to extend that monopoly well beyond the time limits of the patent protections afforded to oxybate drugs themselves.  *See infra* at 6 (discussing ongoing federal investigation of Jazz).  In this case, only one Jazz patent is now at issue—its '963 patent for a drug distribution system.  That particular patent is not subject to FDA's certification regime for at least four reasons.

*First*, Congress set out a process in Section 505(b)(2)(A) for certification to certain patents, providing that a certification would be made in the applicant's "opinion . . . and to the best of [its] knowledge."  Congress could have placed this "Opinion Clause" so it only applied to certain limited factual questions by, for example, moving the "Opinion Clause" into "Paragraph IV" of Section 505(b)(2)(A), so the text required an applicant to certify, "*in the opinion of the applicant and to the best of his knowledge* that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug."  But Congress chose not to draft the provision this way.

Likewise, Congress could have indicated that the obligation to certify applies to any patent that, in the *judgment of the Secretary*, claims a drug or use for a drug.  Again, Congress did not write Section 505(b) in that manner.  Instead, the Opinion Clause appears at the outset of the patent certification provision and must apply to all of the applicant's judgments thereafter relevant to certification.  Functionally, an applicant must first reach an opinion and make a judgment regarding which patents can trigger a certification—*i.e.*, whether a patent claims the drug or a use for the drug.  If the answer to the initial question is yes, then the second question is whether the certification falls under Paragraphs I-IV of Section 505(b)(2)(A).  At that stage, only Paragraph IV requires genuine exercise of opinion or judgment; the other Paragraphs are largely mechanical.

The Federal Defendants and Jazz essentially argue that the Opinion Clause, despite its position at the outset of the statutory text, only genuinely applies to Paragraphs I-IV.  This requires the reader to skip all 48 words in between and assume—contrary to the explicit text—that Congress

intended without saying that FDA and not the applicant would make the necessary judgments about which patents require a certification.  That position is counter-textual.  It is also directly contrary to FDA's binding regulation at 21 C.F.R. § 314.50(i)(1)(i)(A), which expressly sets forth Avadel's interpretation that the Opinion Clause applies to whether a patent "claims" a "use" for "such drug" for which the applicant seeks approval.  There is no basis to defer to FDA's view here, and FDA's suggestion that it has been unfairly denied *Chevron* deference rings hollow.  Even if the text of the statute were ambiguous (it is not), there would have been no lawful basis for FDA to deviate from its regulation in the Patent Decision or for this Court to defer to FDA's conflicting interpretation in this case.  Moreover, FDA has acknowledged that it has no expertise to conduct any substantive patent policing.  Nor could it—practically, there are thousands of patents listed in the Orange Book.  An applicant, not FDA, knows which use codes are most likely to be applicable, and is accordingly empowered to make that judgment under the statutory scheme.

Had Avadel been permitted to stand on its original patent statement, Jazz could have sought the normal relief that any patent holder may seek—it could file a patent infringement lawsuit (as it already has done, twice), and request a preliminary injunction against LUMRYZ's marketing.  But FDA's Decision compelling a certification erroneously delivered Jazz a statutory delay on LUMRYZ's approval—a thirty-month stay during which competition remains foreclosed, unless and until Avadel can convince a judge, however many months later, to release the stay.

*Second*, even if FDA were correct about the "Opinion Clause" in Section 505(b)(2)(A) (it is not), FDA could not require any certification here to U-1110.  ████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████████████████████████████████████████  It is

too late now for FDA to disavow those core findings.  Congress could not have meant to require

certification of distribution system use codes when it referred to patent information that "claims"

a "use" for "such drug"—here, a use for sodium oxybate itself.

*Third*, FDA's regulations allow it to look, if at anything, at the use code for the '963 patent,

and to compare that use code only to Avadel's "labeling" to reach a conclusion about certification.

But FDA looked beyond the four corners of Avadel's labeling to an extrinsic "LUMRYZ REMS

Document," to locate a reference to a "computer database," and then erroneously found an overlap

with Jazz's use code.  That "LUMRYZ REMS Document" is not part of Avadel's labeling:  It will

not be attached to the drug or its containers, and it will not accompany the drug to patients or

prescribers.  Instead, the LUMRYZ REMS Document is an internal FDA document that, at most,

may eventually be loaded onto FDA's public website, like FDA's other public-facing dockets.

Accordingly, FDA violated its own regulation by relying on the LUMRYZ REMS Document.

*Fourth*, even if FDA could look beyond the proposed LUMRYZ labeling (it cannot),

U-1110 describes the use of a single, centralized "computer database" for drug distribution.  That

is how Jazz's FDA-approved REMS works:  Using a single central database, one central pharmacy,

and other restrictions.  The proposed LUMRYZ REMS functions differently:  It will operate with

multiple central pharmacies and use four separate and distinct computer databases to control the

distribution of LUMRYZ.  FDA arbitrarily and capriciously concluded that Avadel's REMS

distribution system somehow overlapped with Jazz's REMS, as described in its use code.

Perhaps sensing that FDA has acted beyond its authority here, Jazz also raises other novel arguments—none of which the Federal Defendants join—including that Congress has stripped the District Courts of their normal jurisdiction to review final agency action under the APA that arises during FDA's new drug approval process.  That argument not only does violence to 21 U.S.C. § 355(h), which narrowly commits direct-review jurisdiction in the Court of Appeals over only NDA *denial orders*, but it would revolutionize this Court's jurisdiction, pursuant to which this Court routinely rules on final FDA orders, including tentative approvals, that arise *during* the NDA process.  That includes cases like *Purepac Pharm. Co. v. Thompson*, 238 F. Supp. 2d 191, 202-03 (D.D.C. 2002), *aff'd*, 354 F.3d 877, 882 (D.C. Cir. 2004), in which this Court literally reviewed a near-identical compelled certification letter-decision as "final agency action."

Despite Jazz's efforts to complicate these proceedings by injecting these and many other extraneous issues that the Federal Defendants decline to join, the fact remains that the issues raised by FDA's Patent Decision are legal in nature and merit expedited redress by this Court.  The Court should set aside the Patent Decision and order FDA to decide the LUMRYZ NDA within 14 days.

## ARGUMENT

The record produced by FDA in this case now reveals how the current dispute arose. ███

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████

This is not novel behavior from Jazz.  Indeed, Jazz has been sued by a class of drug purchasers, including many of our nation's largest insurers, for a range of allegedly anticompetitive conduct specifically related to the '963 patent and a range of other patents addressing Jazz's narcolepsy drug Xyrem.  *See* Am. Complaint, *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, No. 20-2966 (N.D. Cal.), Dkt. 62.  Likewise, just after *this* case was filed, Jazz disclosed that the U.S. Attorney's Office for the District of Massachusetts has issued a subpoena for documents related to Xyrem, one of Jazz's Xyrem-related patents, and Jazz's communications with FDA, investigating apparently related Jazz conduct.[1]  Indeed, that investigation implicates a Jazz patent ████ is not only subject to the antitrust suit.███████████████████████████████████████████ ████████████████████████████████████████████  And lest there be some misconception that Jazz's behavior is normal industry practice, it is not: Although FDA has approved hundreds of REMS, approximately 60 of which remain in force, Avadel has identified only *one* other drug (Fintepla, a seizure drug) with REMS patents currently in the Orange Book.[2]

Here, Jazz's behavior is important because it appears to be directly in violation of 21 U.S.C. § 355-1(f)(8).  There, Congress left no doubt regarding its concern about anticompetitive conduct in the specific context at issue here—a 505(b)(2) application.  Congress recognized that an applicant could attempt exactly what Jazz has tried here—foreclose competition by patenting a basic element of a REMS safety system, and then argue that such safety element is indispensable

---

[1] Jazz Pharmaceuticals, Form 10-Q at 72 (Aug. 3, 2022), available at https://www.sec.gov/ix?doc=/Archives/edgar/data/1232524/000123252422000035/jazz-20220630.htm

[2] *See generally* FDA, Orange Book (Fintepla) https://www.accessdata.fda.gov/scripts/cder/ob/patent_info.cfm?Product_No=001&Appl_No=212102&Appl_type=N

to the distribution of later entrants' drugs.  Congress therefore provided that no holder of an approved drug application covered by a REMS, like Jazz, "shall use any element to assure safe use required by the Secretary under this subsection to block or delay approval of an application under section 355(b)(2) or (j) of this title," *i.e.*, to delay a 505(b)(2) applicant, like Avadel, from reaching the market.  21 U.S.C. § 355-1(f)(8).  But this is precisely what has happened here, through Jazz's abuse of U-1110.  At the very least, 505-1(f)(8) confirms Congress's intent that REMS and REMS use codes cannot be utilized for this purpose.  It is not possible to harmonize Congress's intent in 505-1(f)(8) with Jazz's and FDA's new interpretation of 505(b)(2)(A) and their other positions in this case, all of which are unavoidably delaying the final approval of Avadel's NDA.

Here, there is no basis for this Court to uphold FDA's Patent Decision blessing Jazz's abuse.  This Court has jurisdiction over this matter, and the Patent Decision cannot withstand review.  Indeed, Avadel has identified four independent grounds to set aside the Patent Decision, any *one* of which would merit *vacatur*.

# I.   JAZZ'S REVIEWABILITY CHALLENGES ALL FAIL

## A.   Congress Has Not Stripped This Court's Jurisdiction

Before diving into the merits, we can quickly dispose of Jazz's arguments on subject matter jurisdiction, which the Federal Defendants have not joined.  Jazz claims this Court lacks jurisdiction because the case belongs in the Courts of Appeals.  That is wrong.  Absent "a provision authorizing review in the court of appeals, challenges to agency action to which the APA's judicial review provisions apply fall within the district court's federal question jurisdiction under 28 U.S.C. § 1331."  *Micei Int'l v. Dep't of Com.*, 613 F.3d 1147, 1152 (D.C. Cir. 2010).  Here, no statute authorizes review of the Patent Decision in the Courts of Appeals.

Jazz's argument (at 13-15) relies on 21 U.S.C. § 355(h), which provides that "[a]n appeal may be taken by the applicant from an order of the Secretary refusing or withdrawing approval of

an application under this section," and the D.C. Circuit's decision in *Nostrum Pharmaceuticals, LLC v. FDA*, 35 F.4th 820 (D.C. Cir. 2022).  In *Nostrum*, the D.C. Circuit held it lacked direct-review jurisdiction under Section 355(h) over a "complete response letter" ("CRL")—a letter from FDA which "describe[s] all of the specific deficiencies that the agency has identified" in a drug application and provides the applicant an opportunity to submit the pertinent information.  35 F.4th at 825.  Section 355(h) and *Nostrum* are unremarkable.  Congress vested jurisdiction in the Courts of Appeals over an "order of the Secretary refusing or withdrawing an approval of an application," and a CRL, by definition, is not such an order.  21 U.S.C. § 355(h).  It is an interim step—not even "final agency action" subject to review in any court under the APA.  *Nostrum*, 35 F.4th at 825.

*Nostrum* is correct as far as it goes, but Jazz is attempting (at 13-15) to stretch it beyond recognition to establish a far broader proposition—that the Courts of Appeals not only have jurisdiction over "order[s] of the Secretary refusing or withdrawing approval of an application," but also any order involved in the NDA approval process.  *Nostrum* held no such thing.  District Courts routinely hear APA challenges to final FDA orders issued as part of the NDA process that are not orders "refusing or withdrawing approval of an application," and many of those challenges have been affirmed on appeal.[3]  Indeed, this Court has heard—and the D.C. Circuit has affirmed—

---

[3] *See, e.g.*, *Teva Pharm. USA, Inc. v. Sebelius*, 638 F. Supp. 2d 42, 53 (D.D.C. 2009), *aff'd in relevant part, rev'd in unrelated part*, 595 F.3d 1303, 1304, 1309, 1311 (D.C. Cir. 2010) (holding ANDA applicant's challenge to FDA's decision, in a "tentative approval," to not to grant Teva exclusivity was "ripe" prior to "final approval"); *Apotex Inc. v. FDA*, 414 F. Supp. 2d 61, 63, 64 (D.D.C. 2006), *aff'd*, 226 F. App'x 4 (D.C. Cir. 2007) (no jurisdictional bar to challenge to "FDA's decision to deny immediate approval to Apotex" where "FDA granted tentative approval" but "delayed final approval" due to "180–day exclusivity"); Order Den. of Mot. for Prelim. Inj., *Purepac Pharm. Co. v. Friedman*, No. 1:98-cv-01780-RCL (D.D.C. 1998), *aff'd*, 162 F.3d 1201 (D.C. Cir. 1998) (similar decision on tentative approval); Order Den. of Mot. for Prelim. Inj., *Teva Pharm., USA, Inc. v. FDA*, No. 1:99-cv-00067-CKK (D.D.C. 1999), *rev'd in unrelated part*, 182 F.3d 1003, 1004 (1999) (no jurisdictional bar to suit seeking "injunction making Teva's ANDA effective," where ANDA was "tentatively approved" but "ineligible for final approval"); *Mylan*

multiple challenges in exactly this posture. *Purepac* found that FDA's near-identical letter-decision that an applicant "must submit" a "patent certification" was reviewable in this Court, notwithstanding that there had been no CRL, no denial, and the ANDA remained pending. 238 F. Supp. 2d at 202-03, *aff'd*, 354 F.3d 877. Similarly, in *Ranbaxy Labs. Ltd. v. FDA*, this Court upheld FDA's decision that an applicant's "certifications" were "invalid," and thus, "approval" of the ANDAs was properly "delayed." 307 F. Supp. 2d 15, 21 (D.D.C. 2004), *aff'd*, 96 F. App'x 1 (D.C. Cir. 2004); *see also TorPharm, Inc. v. Thompson*, 260 F. Supp. 2d 69, 83-84 (D.D.C. 2003) (upholding FDA's decision that a "certification" was "improper"), *aff'd*, *Purepac*, 354 F.3d 877.

*TRAC v. FCC* is not to the contrary. 750 F.2d 70, 78–79 (D.C. Cir. 1984). To be sure, the D.C. Circuit there held that where "a statute commits review of agency action to the Court of Appeals, any suit seeking relief that might affect the Circuit Court's future jurisdiction is subject to the exclusive review of the Court of Appeals." *Id.* But the critical thing Jazz misses is that the judicial review provision there provided near plenary review over all orders of the agency. 28 U.S.C. § 2342(1); 47 U.S.C. § 402(a). As *TRAC* recognized, the scope of jurisdiction-stripping depends on the breadth of the Courts of Appeals' direct-review jurisdiction: If "the underlying claim is not subject to the jurisdiction of the Court of Appeals," "adjudication of the claim in the District Court will not affect any future statutory review authority of the Circuit Court." 750 F.2d at 78.[4] Here, unlike in *TRAC*, and as *Nostrum* recognized, Section 355(h) is not plenary. Rather, it is exceedingly narrow, covering a very specific type of order—an order refusing or withdrawing

---

*Pharms., Inc. v. Sebelius*, 856 F. Supp. 2d 196, 206 (D.D.C. 2012) (no bar to compel FDA to "immediately approve Mylan's ANDA"); *Veloxis Pharms., Inc. v. U.S. FDA*, 109 F. Supp. 3d 104, 106 (D.D.C. 2015); *Barr Lab'ys, Inc. v. Thompson*, 238 F. Supp. 2d 236, 250, 255 (D.D.C. 2002).

[4] Jazz's cases (at 13-14) all concern direct-review provisions of agencies like the FCC (*TRAC*), FTC (*Jamison*), Civil Aeronautics Board (*AAPA*), Nuclear Regulatory Commission (*Zech*), and Mine Safety and Health Administration (*Zegeer*) that, unlike the FDCA, broadly commit direct review of broad swaths of agency orders, if not all agency orders, to the Courts of Appeals.

approval of an NDA.  That does not sweep within its scope all potential orders related to an NDA.

The Supreme Court, the D.C. Circuit, and this Court have recognized as much.  In *Weinberger v. Bentex Pharmaceuticals, Inc.*, the Supreme Court held that that while "an order denying an NDA or withdrawing one is reviewable by the Court of Appeals, § 505(h)," "an order that does not deny or withdraw an NDA is reviewable under the Administrative Procedure Act," for instance, "if it declares a 'new drug' status."  412 U.S. 645, 651 (1973).  That is, the FDCA's narrow provisions for direct review in the Courts of Appeals "do not manifest 'a congressional purpose to eliminate judicial review of other kinds of agency action.'"  *Id.*  In *Cutler v. Hayes*, the D.C. Circuit addressed this issue head on, explaining that Section 355(h) differs from the plenary review provision in *TRAC*, and thus, where FDA action is not subject to "specialized review provisions" like Section 355(h), "*TRAC* does not apply," and FDA action is "directly reviewable in a district court."  818 F.2d 879, 887 n.61 (D.C. Cir. 1987)*.*  Because Section 355(h) "authorizes review by a court of appeals only in cases challenging disapprovals of new-drug applications," it is "therefore inapplicable" to any other agency action short of a final *denial* order.  *Id.*  Jazz simply ignores *Cutler* because it is fatal to Jazz's argument.  The D.C. Circuit reaffirmed *Cutler* in *In re NRDC*, explaining that if an FDA order does not clearly fall within a direct review provision under the FDCA, jurisdiction lies in the "district court," and the Courts of Appeals will not "assert jurisdiction on the basis of hypothetical scenarios" where "the basis of prospective jurisdiction is a speculative chain of events."  645 F.3d 400, 405 (D.C. Cir. 2011); *see also Moms Against Mercury v. FDA*, 483 F.3d 824, 827 (D.C. Cir. 2007) (district court jurisdiction remains, even if FDA "might subsequently take some action that is directly reviewable in this Court").  And in *Torpharm, Inc. v. Shalala*, this Court considered a near-identical issue, where FDA had "neither refused nor withdrawn approval" of an ANDA, but "tentatively approved" it with a "delayed . . .

effective date" for final approval.  No. 97-1925, 1997 WL 33472411, at *2 (D.D.C. Sept. 15, 1997).  This Court found it had "jurisdiction," because a claim that "FDA's misinterpretation of a statutory provision has operated to deprive [applicant] of immediate approval" did *not* mean FDA "refused to approve plaintiff's ANDA, in the way contemplated in Section 355(h)."  *Id.*

All of these same problems defeat Jazz's related arguments with respect to Avadel's claim that FDA "unreasonably withheld" a final decision *approving* or offering a hearing on the approvability of the LUMRYZ NDA.  As explained above, approval of an NDA is not an issue committed to the Courts of Appeals under Section 355(h).  Thus, this Court has recognized its "jurisdiction" to decide claims that FDA has failed to comply with its 180-day deadline to "approve" or offer "a hearing" on "whether such application is approvable" "under section 706(1) of the [APA]."  *Sandoz, Inc. v. Leavitt*, 427 F. Supp. 2d 29, 34, 36 (D.D.C. 2006).

### B.   The Patent Decision Is Final Agency Action Reviewable under the APA

Contrary to Jazz's arguments (at 15-18), FDA did not err in ███████████████████ ██████████████████████████ and in assenting to review of the Decision before this Court.  An agency action is final when it either "determined" "rights or obligations" *or* "legal consequences" "flow" from it.  *Sackett v. EPA*, 566 U.S. 120, 126 (2012).  And the decision must also mark the "consummation" of the agency's decision-making, *id.*, *i.e.*, "it must not be of a merely tentative or interlocutory nature."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).

Jazz does not contest the Patent Decision "determined" Avadel's "rights or obligations." ████████████████████████████████████ ████████████████████████████████████  That is, FDA "determined" that Avadel has an "obligation[]" to submit a certification.  *Sackett*, 566 U.S. at 126.  The Decision instructed Avadel to take an action.  Jazz admits (at 17) that "the relief that

Avadel seeks" is "to be relieved of the obligation to submit a patent certification." ███████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████  21 U.S.C. § 355(c)(3)(C); *see also Pennaco Energy, Inc. v. DOI*, 377 F.3d

1147, 1155 (10th Cir. 2004) ("legal consequences flow[]" if applicant's activity is "delayed").

The Patent Decision was also the "consummation" of FDA's decision-making on Avadel's

patent statement, because it was not "tentative or interlocutory nature." *Bennett*, 520 U.S. at 177-

78. ███████████████████████████████████████████████████████████

███████  And *Purepac* already found that FDA's near-identical letter-decision that an applicant

"must submit" a "patent certification" "bears the hallmarks of final agency action," including "the

consummation of the agency's decision-making process." 238 F. Supp. 2d at 202-03, *aff'd*, 354

F.3d 877. Contrary to Jazz's arguments (at 14, 16) that only a CRL followed by an NDA denial

is reviewable, in *Purepac*, as here, the applicant had *not* obtained a CRL or a denial of the ANDA;

the ANDA had remained pending for years.[5] Yet that patent decision remained reviewable.[6]

Even putting aside FDA's own characterization of its decision as "final," Jazz's attempt to

characterize the Patent Decision as akin to a CRL that is not "final agency action" fails. Unlike

---

[5] *See id.*; *see also, e.g.*, Ex. 1 to Schlossman Decl., FDA Memorandum of Law at 11, 14, *Purepac*, No. 1:02-cv-01657-ESH (D.D.C.) (Dec. 9, 2002), Dkt. 36 (Purepac's ANDA remained pending).

[6] Jazz gestures in the Background section of its brief—but raises no argument—that Avadel could have "sought reconsideration or supervisory review." But "'[t]he mere possibility that an agency might reconsider . . . does not suffice to make an otherwise final agency action nonfinal.'" *Nat'l Envtl. Dev. Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1006 (D.C. Cir. 2014). "Supervisory review" is also irrelevant: ████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

the CRL at issue in *Nostrum*, which "afford[s] applicants the opportunity to provide additional information" before FDA renders a final decision and carries "no implication as to the ultimate approvability" of an NDA, 35 F.4th at 825-26, ██████████████████████████████

███████████████████████████████████████████████████████████████

████████████. Unlike a CRL, which "open[s] multiple doors" under FDA's CRL regulations by permitting the applicant to, among other options, request a hearing and then appeal within FDA, *Nostrum*, 35 F.4th at 826, no regulations authorized such a hearing or appeal from the Patent Decision, and none was offered. And unlike a CRL, which preserves the possibility of "persuading senior FDA leadership" to change its "mind," *id.*, ███████████████████████

██████████████████████████████████████████████ The Decision, as its states on its face, was final concerning the limited issue decided. *Nat'l Treasury Emples. Union v. FLRA*, 745 F.3d 1219, 1222-23 (D.C. Cir. 2014) ("final agency action 'need not be the last administrative action" under a statute, where an agency makes "a final determination" of a specific "question").[7]

Jazz next suggests that review is precluded because Avadel was required to draw a CRL and ultimately a denial, rather than certify under protest and seek judicial review. But it is well-established that an organization may comply with a final agency order and then seek judicial review. *See Church of Scientology v. United States*, 506 U.S. 9, 15 (1992) ("compliance" with subpoena did not moot case, as seized materials could be "returned"); *United States v. Chrysler*, 158 F.3d 1350, 1353-54 (D.C. Cir. 1998) (compliance with recall order did not moot challenge to that order); *AMA v. Reich*, 955 F. Supp. 4, 7 (D.D.C. 1997) (compliance with agency survey did not deprive agency action of finality), *superseded on other grounds*, *Sturm Ruger v. Herman*, 131

---

[7] Accordingly, Jazz's argument (at 14) that "the Patent Decision did not address the effect of the unexpired ODE [orphan drug exclusivity] covering XYWAV," is beside the point: There is no requirement that a final order decide every conceivable NDA issue in order to be reviewable.

F. Supp. 2d 211, 213 (D.D.C. 2001); *Sackett*, 566 U.S. at 126, 131 (legal consequences flowed from order that "strong-arm[ed] regulated parties" to choose "voluntary compliance" or possible enforcement); *S.F. Herring Ass'n v. Dep't of the Interior*, 946 F.3d 564, 568, 582 (9th Cir. 2019) ("obeying" agency's orders did not deprive them of finality).[8]  Jazz also misses that Avadel could not have lawfully drawn a CRL on this issue.  Tellingly, the Federal Defendants do not argue a CRL could have or would have issued.  That makes sense because FDA did *not* issue a CRL. Instead, FDA has recognized for decades that none of the criteria in Section 355(d), which provide the bases on which FDA may deny an application (and upon which FDA might therefore issue a CRL), allow FDA to question the accuracy of applicants' patent information.[9]  And at least two Circuits have adopted FDA's interpretation.  *See aaiPharma Inc. v. Thompson*, 296 F.3d 227, 239-40 (4th Cir. 2002); *Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1348-49 (Fed. Cir. 2003).[10]

Finally, Jazz argues (at 17) that APA review is unavailable because Avadel possesses an "adequate remedy" elsewhere.  5 U.S.C. § 704.  For the reasons discussed above and as *Nostrum* itself makes clear, review in the Courts of Appeals is not available because the Patent Decision,

---

[8] Such a supposed "choice" to flout FDA was illusory here:  Jazz warns that standing on "[a] false 505(b)(2)(B) statement is potentially criminal."  Dkt. 14 at 4-5.  These are the sorts of "risks" a regulated entity is not required to bear to obtain judicial review.  *See, e.g.*, *U.S. Army Corps of Eng'rs v. Hawkes Co*., 578 U.S. 590, 598 (2016) (mere "risk" of potential penalties suffices).

[9] Section 355(d)(6) does allow FDA to deny an application if "the application failed to contain the patent information prescribed by" Section 355(b).  But as FDA explained and the Federal and Fourth Circuits agreed, "Section 355(d)(6)" requires FDA "action when the NDA fails to list any patents that claim the drug product for which approval is being sought or fails to include a declaration that there are no such patents," but does *not* require FDA to evaluate the *accuracy* of patent information.  Ex. 2 to Schlossman Decl., Response Brief of FDA and HHS at 14, *Apotex, Inc. v. Thompson*, No. 02-1295, 2002 WL 32941938 (Fed. Cir. Sept. 23, 2002).

[10] Jazz's sole contrary evidence is a redacted, extra-record CRL (Dkt. 24-35), but that confirms a CRL is not a viable or lawful path for review here.  After FDA held the applicant in limbo for 3 years, the CRL did *not* order the applicant to convert a statement to a certification, but to renew certifications it already submitted in its "opinion."  *See also* Ex. 3 to Schlossman Decl., Statement of Material Facts at 15-16, *Takeda v. Zydus*, No. 18-1994 (D. N.J. Feb. 24, 2021), Dkt. 152-1.

although final, is not an "order . . . refusing . . . approval of an application."  21 U.S.C. § 355(h).

Nor is the pending patent case a real "alternative."  The suits involve different questions:  In the

Delaware case, whether the *'963 patent* properly qualifies for listing in the Orange Book;[11] here,

FDA considered *use code U-1110*, and addressed whether Avadel was required to *certify* to it.  The

Court here must construe Avadel's NDA and use code U-1110; the Delaware court must focus on

whether the '963 patent is properly listed, an issue this Court will not reach.  For example:  In the

Delaware suit, Jazz is arguing (incredibly) that it may list any content it wishes in the Orange Book

regarding the '963 patent, because it would raise a "retroactivity" problem under the statute to

delist the patent.[12]  That is distinct from the patent certification issue here, *i.e.*, whether, *in light of*

*U-1110*, a certification was required.  What is worse, Jazz is trying to short-circuit judicial review

in the Delaware case, arguing that FDA's determination in the Patent Decision is dispositive of the

issues there, *i.e.*, conclusively establishes that Jazz's listing of the '963 patent is proper.  *Supra*

n.12 at 8-9.  So, on Jazz's view, the "alternative" to vacating the Patent Decision here is the patent

case, where (1) that court cannot set aside the Patent Decision, (2) Jazz is arguing that court is not

empowered to overturn its patent listing, either, and (3) Jazz is holding out FDA's Decision as

dispositive of the delisting issues there.  That is far from "clear and convincing evidence" of an

adequate alternative remedy.  *Ramirez v. USCIS*, 310 F. Supp. 3d 7, 23-24 (D.D.C. 2018).

## II.     AVADEL'S CHALLENGE TO THE PATENT DECISION SUCCEEDS

### A.     FDA Lacks Authority To Second Guess an Applicants' Opinion That a Patent Certification Is Inappropriate

#### 1.   *Avadel did not waive its challenge to FDA's lack of statutory authority*

The Federal Defendants (at 12-13) and Jazz (at 18-19) argue incorrectly that Avadel

---

[11] Ex. 4 to Schlossman Decl., Brief at 6, *Jazz v. Avadel*, No. 21-691 (D. Del. June 23), Dkt. 118.

[12] Ex. 5 to Schlossman Decl., Reply Brief at 3-6, *Jazz v. Avadel* (D. Del. Aug. 28, 2022), Dkt. 154.

forfeited its challenge to FDA's statutory authority to compel a patent certification by allegedly failing to present that identical issue to FDA prior to the Patent Decision.  As a reminder, Avadel did not know precisely until the May 2022 Patent Decision why its NDA was being held in administrative limbo, or that FDA intended to compel a certification as to U-1110.  In all of the parties' communications, Avadel was never presented with any specific FDA position on the issue and could not read FDA's mind:  Until the Patent Decision, Avadel was not certain what decision FDA would make or how it would reach it. ████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████ Yet the Federal Defendants and Jazz nonetheless argue that Avadel did not raise the issue with sufficient specificity to preserve it.

While it is true that in some cases a plaintiff must have raised an issue to an agency with specificity in advance, that rule does not apply here.  No statute or regulation requires it in this context, so the question would be whether the Court should impose a "judicially created issue-exhaustion requirement" akin to "the rule that appellate courts will not consider arguments not raised before trial courts," which depends on the degree of "analogy to normal adversarial litigation" in a "particular administrative proceeding." *Carr v. Saul*, 141 S. Ct. 1352, 1358 (2021). The underlying proceeding here was not sufficiently adversarial to apply an exhaustion requirement.  The FDCA instructs that FDA "shall" grant NDAs upon the satisfaction of the statutory criteria, principally focused on safety and efficacy.  21 U.S.C. § 355(b)-(d).  FDA's

16

review of NDAs is generally iterative and cooperative.  The proceedings here were simply not formal or "adversarial enough to support the 'analogy to judicial proceedings.'" *Carr*, 141 S. Ct. at 1360.  Thus, the Federal Defendants' (at 12-13) and Jazz's (at 18-19) cases are inapposite, as they arose in adversarial proceedings or notice-and-comment rulemaking.

Highlighting the point, the lack of formality and adversity in FDA's process here never put Avadel on adequate notice that it would be required to remind FDA to adhere to its statutory limitations.  Any challenge to FDA's determination that it would compel Avadel's certification— which FDA first announced in the Patent Decision—"would have been premature" in preceding communications with the agency.  *FirstHealth Moore Reg'l Hosp. v. Becerra*, 560 F. Supp. 3d 295, 305 (D.D.C. 2021).  FDA did not issue, for example, any kind of order to show cause why Avadel should not be compelled to submit a certification or request any briefing or argument or other formal response on this issue.  Avadel's entitlement to judicial review on the issue "arose at the same time as [Avadel] became aware" that FDA would order Avadel to certify.  *Id.* It was not responding to any specific FDA position on the issue: █████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████

And even if FDA had a point (it does not), the doctrine of futility would prevent any waiver. It would make "little sense . . . to present claims to adjudicators who [we]re powerless to grant the relief requested."  *Carr*, 141 S. Ct. at 1361.  As explained *infra* at 21, FDA's regulation explicitly interprets the Opinion Clause in Section 505(b)(2)(A) to apply to the question of whether an applicant must certify to a patent, agreeing with Avadel's reading of the statute.  21 C.F.R. § 314.50(i)(1)(i)(A).  But FDA has for some time erroneously refused to recognize the significance

of that reading, and instead has issued multiple Federal Register notices claiming (incorrectly and contrary to the statute and regulation) that FDA has authority to make that certification determination itself.  68 Fed. Reg. 36676, 36682 (2003); 81 Fed. Reg. 69580, 69600 (2016).  These advisory opinions tied FDA's hands, despite the contrary statutory and regulatory text.  21 C.F.R. § 10.85(d)(1), (e), (g).  FDA may only change its position by revoking it in a Federal Register "Notice" "in the same manner as notice" of the original "advisory opinion."  *Id.*  Thus, even if Avadel had, without prompting or foreknowledge of FDA's decision, more precisely challenged FDA's position, there is no reason to believe FDA would or could have changed its position.[13]

In support of its claim of waiver, the Federal Defendants say (at 12-13) that they were unfairly denied the opportunity to receive *Chevron* deference, and accordingly they have not asserted it on this issue.  But FDA suffered no prejudice.  *Chevron* deference could only conceivably apply if the Court concludes that it cannot resolve the statutory interpretation issue at *Chevron* Step 1.  As detailed below (*infra* at 19-21), the plain language and structure of the statute foreclose the Federal Defendants' interpretation.  And even if Section 505(b)(2)(A) were ambiguous (it is not), the actual *interpretation* of the provision Federal Defendants advance in this case conflicts with FDA's binding regulation at 21 C.F.R. § 314.50(i)(1)(i)(A), and thus would be ineligible for deference.  *Infra* at 21; *Maupin v. Azar*, 424 F. Supp. 3d 830, 836–37 (C.D. Cal. 2019) (under *Chevron*, agency interpretation is "not reasonable if it conflicts with preexisting regulations"); *White v. United States*, 543 F.3d 1330, 1338 (Fed. Cir. 2008) (similar).

### 2.   FDA lacks statutory authority to police patent certifications and statements

Turning to the substantive legal issue, FDA lacks authority to compel applicants to submit

---

[13] Jazz argues (at 19) that Avadel could have sought "reconsideration," "supervisory review," or a "hearing," but as explained *supra* at n.6 & 13, the former options are irrelevant to judicial review; the latter option was neither offered nor available; and any of these options would have been futile.

patent certifications in place of statements.  It is undisputed that the FDCA never expressly authorizes any of that.  Instead, the Federal Defendants (at 13-16) and Jazz (19-22) argue why such authority should be read into the statute, identifying a host of disparate provisions (as to which they cannot agree) that, they say, create this power by implication.  But this is all revisionism: When FDA issued its Federal Register notice asserting power to "determine whether the applicant must submit a patent certification," it acknowledged the "absence of explicit statutory language" authorizing such a regime and relied on policy arguments.  68 Fed. Reg. at 36,6832-83.

In any event, FDA's Federal Register notice was only half right: While there is no "explicit statutory language" authorizing FDA's approach, the statute's text unambiguously forecloses FDA's seizure of this authority to compel certifications.  Under the FDCA, an NDA shall include:

> (A) a certification, *in the opinion of the applicant and to the best of his knowledge*, <u>with respect to each patent which claims the drug for which such investigations were conducted or which claims a use for such drug for which the applicant is seeking approval under this subsection and for which information is required to be filed under paragraph (1) or subsection (c)</u>—
>
> > (i) that such patent information has not been filed,
> > (ii) that such patent has expired,
> > (iii) of the date on which such patent will expire, or
> > (iv) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted; and
>
> (B) if with respect to the drug for which investigations described in paragraph (1)(A) were conducted information was filed under paragraph (1) or subsection (c) for a method of use patent which does not claim a use for which the applicant is seeking approval under this subsection, a statement that the method of use patent does not claim such a use.

21 U.S.C. § 355(b)(2).  The crux of the Federal Defendants' (at 14-15) and Jazz's (at 23) arguments is that the italicized requirement to provide a certification "in the opinion of the applicant and to the best of his knowledge" does not modify the immediately following obligation to provide a certification "with respect to each patent . . . which claims a use for such drug for which the applicant is seeking approval under this subsection," but must be read to *skip over* the intervening

48 underlined words, and modify the information provided in Paragraphs (i) through (iv).

That interpretation is incorrect: Jazz's lead case confirms that ordinarily "modifiers and qualifying phrases attach to the terms that are nearest," rather than "modify other, more-distant language." *City of Salisbury v. FERC*, 36 F.4th 1164, 1169 (D.C. Cir. 2022); *see also Grecian Magnesite Mining, Indus. & Shipping Co., SA v. Comm'r of IRS*, 926 F.3d 819, 824 (D.C. Cir. 2019) (same); *United States v. Laraneta*, 700 F.3d 983, 989 (7th Cir. 2012) ("[A] modifier at the beginning . . . of a series of terms modifies all the terms."). This "skip 48 words" theory of statutory interpretation is particularly odd here, because Paragraphs (i)-(iii) speak to obvious facts to which no real "opinion" could be offered, like whether a "patent has expired" or "will expire" on a given "date." 21 U.S.C. § 355(b)(2)(A)(i)-(iii).[14]  And to the extent the Opinion Clause modifies Paragraphs (i)-(iv), that does not mean it does not *also* modify "claims a use for such drug for which the applicant is seeking approval." 21 U.S.C. § 355(b)(2)(A). On the contrary, it *reinforces* that it does, because subsections (i)-(iv) expressly incorporate the prior clause by reference to "such patent" as described in the prior clause. Jazz's related argument (at 20) that the "opinion of the applicant" also modifies the term "certification" further supports Avadel's position:  It is undisputed that one of the issues that must be addressed by a "certification" is whether the drug "claims a use for such drug for which the applicant is seeking approval." 21 U.S.C. § 355(b)(2)(A). And at a minimum, all parties agree that it is necessary to read beyond the word "certification" to determine which issues must be attested to "in the opinion of the applicant."

---

[14] Jazz relatedly claims (at 22-23) that, since certifications must be to "fact[s]," the Opinion Clause serves no other function than to afford applicants some leniency in the event that their certifications to specified "facts" turn out to be incorrect.  However, Jazz's premise that certifications are ordinarily made solely to facts, and not also opinions, is simply incorrect. *See Certification*, Black's Law Dictionary (11th ed. 2019) (defining "certification" as "[t]he act of attesting; esp., the process of giving someone or something an official document stating that a specified standard has been satisfied"); *Certify*, Black's Law Dictionary (11th ed. 2019) (similar).

Moreover, the interpretation of Section 505(b)(2)(A) that Federal Defendants are now advancing (at 14-15)—that the Opinion Clause only applies to Paragraphs I-IV—is contrary to FDA's binding regulations.  For nearly 2 decades, FDA's regulations have *agreed* with Avadel that the Opinion Clause also applies to whether a patent claims a drug or use for a drug:

> A 505(b)(2) application is required to contain . . . [a]n appropriate patent certification or statement with respect to each patent issued by the U.S. Patent and Trademark Office that, *in the opinion of the applicant and to the best of its knowledge, claims* the drug substance or drug product on which investigations that are relied upon by the applicant for approval of its 505(b)(2) application were conducted *or that claims an approved use for such drug and for which information is required to be filed under section 505(b) and (c) of the Federal Food, Drug, and Cosmetic Act and § 314.53.*

21 C.F.R. § 314.50(i)(1)(i)(A).  Those regulations then go on to state that the Opinion Clause *also* applies to the type of certification to make.  *Id.* ("For each such patent, the applicant must provide the patent number and certify, in its opinion and to the best of its knowledge, one of the following circumstances: [Discussing Paragraph I through IV]").  FDA doubled down on the same interpretation in 2015, when it explained in an advisory opinion that binds the agency that "505(b)(2) and ANDA applicant[s] currently are required to submit a patent certification or statement for each patent issued by the PTO that, *in the opinion of the applicant and to the best of its knowledge, claims* the listed drug or [reference listed drug] or that *claims an approved use for such drug for which the applicant is seeking approval* and for which information is required to be filed under section 505(b) and (c) of the FD&C Act and § 314.53."  80 Fed. Reg. 6,802, 6,847 (2015); *see also* 81 Fed. Reg. 69,580, 69,634 (2016) (similar advisory opinion).  Yet again, "[i]t is unclear why here in litigation, FDA takes a position so clearly in opposition to its regulations." *Genus Lifesciences, Inc. v. Azar*, 486 F. Supp. 3d 450, 465 (D.D.C. 2020).

Since the statute unambiguously forecloses the agency from *compelling* a patent certification, the Federal Defendants (at 13-16) and Jazz (at 22-25) fall back on their view that the

agency can reject a non-compliant patent *statement*, because the Opinion Clause should not be read to extend to the patent *statement* provision in 21 U.S.C. § 355(b)(2)(B).  So, they reason, FDA must necessarily be able to compel a certification.  The problems with this argument are numerous.  First, even if the Opinion Clause does not apply to statements, the Federal Defendants and Jazz have not identified a grant of Congressional authority that would even allow FDA to reject a statement—the statute does not frame a statement, for example, as "in the opinion of the Secretary."  Second, even if FDA had the implicit power to reject a statement, that would not imply a corresponding power to compel a patent certification "in the opinion of the applicant and to the best of his knowledge," which the Federal Defendants (at 14) acknowledge FDA did in the Patent Decision.  Such a reading would render Congress's express language in the Opinion Clause surplusage.  *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

The Federal Defendants claim (at 15) that they must be right because, pursuant to the statute, there must be "either a certification or a statement."  Not quite.  It is true that an NDA must include at least *one* certification or statement to be complete.  *See Genus Lifesciences, Inc. v. Azar*, No. 20-211, 2021 WL 270409, at *3 (D.D.C. Jan. 27, 2021) (holding that the effective date provisions for 505(b)(2) applications only function if there is at least one statement or certification).  But this NDA contained many statements and certifications, so that rule is inapplicable.  There is no statutory requirement that a certification or a statement must be submitted *with respect to every single patent* that pertains to a drug.  *See id.*; 21 U.S.C. § 355(b)(2)(A)-(B).

That is clear from the language in subsections (A) and (B).  Those provisions are not mirror images, so the fact a statement is impermissible under (B) does not necessarily mean a certification is necessary under (A).  Under subsection (A), certifications are subject to a heightened requirement that the incumbent patent "claims a use *for such **drug*** for which the applicant is

seeking approval," while patent statements are appropriate for an incumbent "patent which does not *claim a use* for which the applicant is seeking approval"—*i.e.*, the statement provision lacks the "such drug" language from the certification provision, meaning that the statement provision can sweep more broadly. *Id.* (emphases added). Thus, FDA's view that U-1110 does not qualify for a statement, as a use code that "does not claim a use for which the applicant is seeking approval," *id.*, would not, by itself, show that U-1110 "claims a use *for such **drug*** for which the applicant is seeking approval" and is subject to certification. *Id.* § 355(b)(2)(A).

There is still another problem with deriving a power to compel patent certifications from an alleged power to police patent statements:  Statements are only available for a patent describing a "use" patent, while certifications more broadly apply to both "use" patents *and* drug product patents that "claim[] the drug" itself. *Id.* § 355(b)(2)(A)-(B). So, if a purported power to compel certifications arises from the purported power to police statements, that compelled certification power would attach only to "use" patents, not drug product patents.  Why would Congress do that?

FDA's and Jazz's remaining, revisionist sources of authority are unavailing.  The Federal Defendants point (at 13) to 21 U.S.C. § 393 as "giv[ing] FDA the authority to execute [the FDCA's] provisions."  But "[a]n agency's general rulemaking authority plus statutory silence does not [ ] equal congressional authorization." *Merck & Co. v. HHS*, 385 F. Supp. 3d 81, 92 (D.D.C. 2019) (Mehta, J.).  Jazz disagrees with FDA, relying (at 21) on 21 U.S.C. § 355(d)(6), which allows FDA to deny an NDA if it "failed to contain the patent information prescribed by subsection (b)."  FDA does not assert that authority, and Jazz's argument is wrong for the reasons explained above (*supra* at 14 & n.9)—FDA has disclaimed this authority under that provision for years.  Jazz's reliance (at 20-21) on Section 355(e)(5), which allows FDA to withdraw approval of an NDA that "contains any untrue statement of a material fact," is also wrong.  A judgment whether a use code

"claims" "a use" for a drug amounts to a legal question (the one before this Court), not a "statement of material fact."  21 U.S.C. § 355(e)(5).  And, of course, FDA has made no finding in this case that would support invocation of that clause.  FDA did not, for example, conclude that Avadel's opinion that it need not certify was insincere.  To the contrary, it was apparently a close enough question in FDA's view to justify issuing a 16-page Patent Decision.

Next, Federal Defendants contend (at 13 n.7) that courts have upheld FDA's authority to review patent certifications and statements.  However, these cases never discussed, much less decided, whether FDA has authority to compel patent certifications.  FDA's citation to *Dr. Reddy's Laboratories, Inc. v. Thompson*, is also unavailing.  302 F. Supp. 2d 340 (D.N.J. 2003).  There, the District of New Jersey upheld FDA's authority to compel an ANDA applicant to file a patent *statement* in place of a certification under ANDA (generic) provisions.  *Id.* at 363-66.  Avadel does not necessarily agree with that case, but even on its own terms, it supports Avadel's position rather than undercuts it.  As detailed above, the power to compel a patent statement, as *Dr. Reddy's* purported to find, does not imply a corresponding power to compel a certification "in the opinion of the applicant."  *Supra* at 21-22.  The court expressly relied on the distinction of the "opinion of the applicant" language governing a certification, whereas there is "no mention of the applicant's opinion *with respect to section viii statements*," with the court expressly recognizing that "certifications . . . *are to be made in the opinion of the applicant*."  *Id.*  (emphases added).

Finally, Federal Defendants (at 15-16) and Jazz (at 25-26) fall back on policy arguments.  But such arguments are insufficient to overcome the statute's text and structure.  *Eagle Pharms., Inc. v. Azar*, No. 16-790, 2018 WL 3838265, at *9 (D.D.C. June 8, 2018).  And in any event, contrary to their claims, Avadel's position would not eliminate patent certifications or compromise the statutory scheme.  Most obviously, Federal Defendants and Jazz overlook that ████

████████████████████████████████████████████████████████

████████████████    It is unlikely that NDA applicants will knowingly falsify patent submissions—

*i.e.*, submit a statement when in their opinion a certification is necessary—because intentional

fraud on FDA is unlawful.  *See* 18 U.S.C. § 1001(a).  At most, deferring to the "opinion of the

applicant" might result in fewer certifications and more statements in close cases where the patent

issues are reasonably debatable.  But Congress's choice to defer to the "opinion of the applicant"

in close cases makes good sense in light of its goal of expediting entry, as well as FDA's admitted

lack of "expertise" and "authority" to engage in patent analysis.  68 Fed. Reg. at 36,683.  Nor is

an incumbent deprived of remedies to address alleged infringement; it can pursue the normal

remedy of a preliminary injunction.  None of this was an unreasonable choice for Congress to

make in cases of reasonable, good-faith disagreement, especially in light of well-documented

difficulties in ensuring the Orange Book's accuracy in the first place.  *Purepac*, 354 F.3d at 884.

**B.    The LUMRYZ NDA Does Not Seek Approval of a "Use For" Sodium Oxybate, Nor a "Condition of Use," Claimed by U-1110**

In its Motion, Avadel demonstrated that, even assuming FDA is authorized to compel

patent certifications, the Patent Decision was unlawful, because the LUMRYZ NDA does not seek

approval for any use for a drug, much less a use of sodium oxybate, that is described in U-1110.

Avadel Mot. at 24-30.  The Federal Defendants' and Jazz's contrary arguments fail.[15]

*1.    U-1110 does not describe a use for "such drug"*

a.    U-1110 does not describe a use for *any* drug

A patent certification is only required when a patent "claims the drug" or "claims a use for

---

[15] The Federal Defendants claim (at 16) the entire Patent Decision qualifies for arbitrary and capricious review (and accordant deference).  Not so.  Courts "always first examine the statute de novo" and "accord the agency's interpretation no deference" if it is clear.  *NACAA v. EPA*, 489 F. 3d 1221, 1228 (D.C. Cir. 2007).  And FDA must not "offer[] an explanation for its decision that runs counter to the evidence[.]" *MVMA v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983).

[the] drug for which the applicant is seeking approval."  21 U.S.C. § 355(b)(2)(A).  U-1110 does

not describe a "use for such drug," *i.e.*, a "use for" sodium oxybate as required by 21 U.S.C.

§ 355(b)(2)(A) to trigger a patent certification.  As always, the interpretative exercise begins with

the text.  *See Ross v. Blake*, 578 U.S. 632, 638 (2016).  And here it ends there as well, because the

statute's meaning is clear.  The statute does not define what it means to "use" a "drug," so the

Court looks to those terms' plain meaning.  *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202,

207 (1997).  In this context, "use" means to "consume," "take," or "put into service."  *Use*,

Merriam Webster (2022).  The "use" for a "drug," therefore, relates to administering it to a

patient.[16] ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████  FDA's implementing regulation, 21 C.F.R. § 314.50(i)(1)(i),

(iii)(B), requiring a certification to a "use for such drug" or a "condition of use," confirms this

interpretation.  The Federal Defendants seem to accept (at 17-18) that a certification could not be

compelled by that regulation unless it was also required by the statute, and that the Court should

read that regulation consistent with FDA's longstanding interpretation of a "condition of use" as

relating to how the drug is administered to a patient.  Indeed, the Federal Defendants point (at 17)

to their 2016 amendments to this regulation, which made explicit that "conditions of use," as used

in this very regulation, include the drug's "dosing regime."  81 Fed. Reg. 69580, 69607 (2016).  In

sum, a certification would be required with respect to the use code U-1110 only if U-1110 relates

---

[16] The legislative history cited by FDA (at 16) confirms this plain language:  Certifications are
required "[w]ith respect to all product patents which claim the listed drug and *all use patents which
claim an indication for the drug for which the applicant is seeking approval* . . . ."  H. Rep. No.
98-857(l), 1984 WL 37416, 1984 U.S.C.C.A.N. 2686, 2703; *Allergan, Inc. v. Alcon Labs., Inc.*,
200 F. Supp. 2d 1219, 1229 (C.D. Cal. 2002) (discussing this history).

to how the drug is administered to a patient with narcolepsy.

U-1110 does not.  To be sure, Jazz has misleadingly added the words "method of treating a patient with a prescription drug" to the beginning of its use code, and the Federal Defendants (at 17) likewise try truncating U-1110 in their brief to focus on just that text.  But that is not a permissible way for an agency to read text of legal significance.  *See, e.g.*, *Jones v. United States*, 527 U.S. 373, 389 (1999) ("[L]anguage must be read in context and a phrase 'gathers meaning from the words around it.'"); *Motor Vehicle Mfrs.*, 463 U.S. at 43 (agency cannot fail to "consider an important aspect of the problem").  FDA must read the use code in context and in light of the record, as the D.C. Circuit specifically instructed FDA to do in *Purepac* when it affirmed this Court's ruling setting aside FDA's decision compelling a patent certification.  354 F.3d at 883.

The D.C. Circuit explained there that FDA must determine—based on the "entire record," including the patent holder's own representations to FDA—what a use code covers.  *Id.* at 884-85. The D.C. Circuit rejected the Federal Defendants' contention that FDA can ignore its "entire record" and rest on a "legal fiction" that a "use code," by virtue of its very Orange Book listing, describes a "use" of a drug that could trigger a certification.  *Id.*; *see also* 238 F. Supp. 2d at 204 (rejecting this "legal fiction").  FDA knew this when it wrote its Patent Decision:  In accordance with *Purepac*, █████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

27



■ FDA could not ignore Jazz's construction of U-1110; it could not "disregard[] unambiguous patent descriptions submitted" by Jazz into the record. *Purepac*, 238 F. Supp. 2d at 209.

FDA's construction of U-1110 is fatal to the Federal Defendants' arguments here because a distribution system to limit diversion of a drug to non-patients does not describe how the drug is administered to a patient with narcolepsy, as required by the statute to trigger a certification. The Federal Defendants now seek (at 17) to abandon the Patent Decision's construction and apply a broader construction of U-1110 as a "use" for a "drug." But that post-hoc reasoning can be disregarded—FDA's Decision may only be upheld on the basis articulated by the Decision itself. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). ███████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████ *Purepac,*

238 F. Supp. 2d at 210 ("FDA may not, consistent with the requirement of reasoned decision-making, impose a requirement on [applicant] incompatible with the agency's own understanding of the facts" by "retreating from its previous position" as to what a "use code" "covers").

And that is the fatal flaw of the Patent Decision. ██████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ is clearly not a "use for such drug," 21 U.S.C. § 355(b)(2)(A), because U-1110 does not relate to how the drug is administered to a patient with narcolepsy. The only permissible conclusion based on the evidence before the agency was that Avadel did not need to certify as to U-1110.

Indeed, this follows from what Congress specifically said in the provision creating the REMS system. In Section 505-1(f)(8), Congress provided that no holder of an approved drug application covered by a REMS, like Jazz, "shall use any element to assure safe use . . . to block

or delay approval" of a 505(b)(2) applicant, like Avadel, from reaching the market.  21 U.S.C. § 355-1(f)(8).  The industry has gotten the message:  Jazz stands nearly alone in maintaining this practice.  *Supra* at 6.  It is not possible to harmonize Congress's Section 505-1(f)(8) with FDA's interpretation of Section 505(b)(2)(A) to sweep up REMS "distribution" use codes.

b.      U-1110 does not describe a use for *sodium oxybate*

U-1110 also does not describe a use for sodium oxybate, as required by the statute.  21 U.S.C. § 355(b)(2)(A).  The Federal Defendants (at 16, 17, 19) and Jazz (at 30) admit U-1110 never mentions "sodium oxybate."  But they now argue (*id.*) that U-1110 is good enough because it describes distribution of a "prescription drug," and "sodium oxybate is a prescription drug."  But the Federal Defendants' reasoning conflicts with the unambiguous statutory text.

Recall that the statute requires "a certification, in the opinion of the applicant and to the best of his knowledge, with respect to each patent which claims the drug for which such investigations were conducted or which claims a use for *such drug* for which the applicant is seeking approval . . . ."  21 U.S.C. § 355(b)(2)(A).  Any "prescription drug" cannot be what Congress meant by its reference to "such drug."  To the contrary, "such drug" refers to the same drug described in the immediately preceding text—"the drug for which such investigations were conducted."  21 U.S.C. § 355(b)(2).  That drug, of course, is a specific one—sodium oxybate—not any "prescription drug."  The broader statutory context confirms the point:  To "claim" a drug or a method of using that drug under Section 355 of the FDCA, it is necessary to expressly describe that drug by name, *i.e.*, the "active ingredient"—not through some more vague description.  *See, e.g., UFCW Local 1776 v. Takeda Pharma. Co. Ltd.*, 11 F.4th 118, 134-35 (2d Cir. 2021) (where an incumbent "patent claim . . . fails to explicitly include the drug," *i.e.* the relevant "active ingredient," it neither claims the drug nor a method of using the drug under Section 355(b)(1)); *In*

30

*re Lantus Direct Purchaser Antitrust Litigation*, 950 F.3d 1, 3, 6, 8 (1st Cir. 2020) (failure to

"mention the drug" meant that patent did not "claim the drug" or "a method of using the drug"

under Section 355(b)).  Congress's demand for specificity makes good sense.  If simply listing "a

prescription drug" suffices to describe "such drug," then *every prescription drug* that seeks FDA

approval and uses a distribution database would need to certify to U-1110.  That cannot be right.[17]

        For all these reasons, the Federal Defendants and Jazz[18] fail to support their reasoning

that U-1110 "claims a use for *such drug*" for which Avadel is seeking approval.

c.      Jazz's other arguments are misdirected

        In a series of arguments that Federal Defendants tellingly do not join, Jazz asserts (at 26-

32) that "the '963 Patent and Use Code 1110 are appropriately included in the Orange Book and

cannot be challenged here."  Jazz's arguments miss the point and egregiously mischaracterize the

relief Avadel is seeking here.  Here, Avadel is not seeking delisting of the '963 patent from the

Orange Book.  The Federal Defendants recognize this.  Fed. Defs.' Br. at 18-19 ("Avadel does not

challenge Jazz's decision to list the '963 patent in the Orange Book.").  Instead, Avadel seeks to

be relieved of the compelled obligation imposed by the Patent Decision to *certify* to U-1110.  To

---

[17] FDA asserts (at 19) that "a use code that does not expressly mention a particular drug can nonetheless describe the use of that drug," citing the factual background in *Caraco Pharmaceutical Laboratories, Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 410-11 (2012).  But that background offers no support:  There, the parties did not dispute that a use code described methods of using a drug, and disputed only the interpretation of a provision of Section 355 that is not at issue here.  *Id.*

[18] Jazz suggests that the Court take into account (at 30) that "the patent is in the record and it refers explicitly to both 'sodium oxybate' and 'Xyrem®.'"  But Jazz cannot have it both ways:  If the Court follows Jazz's position (at 26 n.6) that FDA is prohibited from considering the '963 patent itself, then Jazz's arguments fail, because U-1110 undisputedly never mentions sodium oxybate.  *Supra* at 30.  And if the Court follows Jazz's suggestion (at 30) to review the '963 patent, Jazz's arguments fail, because the '963 patent describes a use of a database for distribution, not a use for a drug.  Avadel Mot. at 30-34.  Indeed, Jazz has construed the '963 patent to "claim[] methods of using a computer-implemented system to safely distribute [GHB] for treatment of a narcoleptic patient"—*not* a method of using sodium oxybate.  Ex. 5 to Schlossman Decl., Joint Claim Construction Brief at 46, *Jazz v. Avadel* (D. Del. July 29, 2022) (No. 1:21-cv-00691), Dkt. 132.

review that, this Court must decide whether *use code U-1110* describes a "use" for "such drug," sodium oxybate, for which Avadel seeks approval.  21 U.S.C. § 355(b)(2).  FDA's decision on these matters is subject to review in this Court, *Purepac*, 354 F.3d at 885*,* and not the patent court, *see* 21 U.S.C. § 355(c)(3)(D)(ii)(I).  Indeed, FDA is not even a party to the patent suit, and that court will have no occasion to opine on whether FDA violated the APA—the issue in this case.

Jazz ignores the case entirely, but the D.C. Circuit already decided this issue in *Purepac*. The Court expressly rejected Jazz's argument here, that a court construing the scope of a "use code," by determining the "use" covered by the code based on the "entire record," would contravene FDA's ministerial role in accepting patent information.  354 F.3d at 883.  There was no bar to FDA or this Court construing the scope of the "use code" to determine whether a new entrant was improperly ordered to file a certification, because the reviewing court would not need to, and would not be authorized to, "address what the *patent* actually covered," and instead must review the *use code*, informed by the "entire record" before FDA.  *Id.* (emphasis added).

The division of labor between this Court and the patent court confirms that Jazz is wrong. When a party seeks to delist a patent from the Orange Book, its remedy is to file a "counterclaim" in a "patent infringement action" to obtain an order "to correct or delete the patent information," if "the *patent* does not claim . . . an approved method of using the drug."  21 U.S.C. § 355(c)(3)(D)(ii)(I) (emphasis added); *see also Caraco*, 566 U.S. at 425 (a counterclaim may "challenge [a] brand's overbroad use code," as beyond the patent scope).  But Avadel is not doing any of that here:  It is not requesting to delist the '963 *patent*; it is not challenging whether the '963 *patent* claims an approved method of use (rendering it un-listable); and it is not challenging the degree of "fit" between the scope of the '963 *patent* and the scope of U-1110.  The only issue in this case, with respect to Jazz's *use code* U-1110, is whether that *use code* describes "a use for

such drug for which the applicant is seeking approval under this subsection" such that FDA could arguably compel a patent certification under the FDCA's distinct patent certification provision.  21 U.S.C. § 355(b)(2)(A).  Because this case will not determine the scope of the underlying '963 patent, or whether the '963 patent should be delisted, the questions here are distinct from those within the patent court's jurisdiction.  *See* 21 U.S.C. § 355(c)(3)(D)(ii)(I).

>    2.    *Avadel's LUMRYZ REMS does not seek approval under 21 U.S.C. § 355(b) for a use for a drug*

Finally, it is time to shift perspectives from Jazz's use code to Avadel's NDA.  As the Federal Defendants note (at 18), to trigger a certification, it is not alone sufficient for Jazz's use code to describe a use for sodium oxybate—the LUMRYZ REMS would also need to constitute a "use for [sodium oxybate] for which the applicant is seeking approval ***under this subsection***."  21 U.S.C. § 355(b)(2)(A).  The language "this subsection," of course, refers to 21 U.S.C. § 355**(b).**

The Federal Defendants argue this standard is met because the REMS "was submitted under section 355(b)."  FDA Br. at 18 (citing 21 U.S.C. § 355-1(a)(1)).  But that misconstrues both the statute and the administrative record.  Section 355(b)(1)(A) describes in detail what is to be submitted under Section 355(b)—absent is anything to do with a REMS.  Instead, a REMS is "submitted" and "approved" under an entirely different *section* of the statute—Section 355-1.  Paragraph (1) of subsection 355-1(a) (titled, "Submission of Proposed Strategy") instructs FDA to determine whether a REMS is necessary. 21 U.S.C. § 355-1(a)(1).  If so, the applicant is to submit to FDA a "proposed" REMS to FDA as part of its application.  *Id.*  Section 355-1(c) then goes on to specify the required contents of the proposed REMS, which can trigger statutory requirements for the participation of multiple review divisions within FDA.  *Id.* § 355-1(c).  Section 355-1(h) then creates an elaborate approval process for the proposed REMS that is distinct from the approval processes under Section 355 in many ways, including through the inclusion of a statutory dispute

resolution process, public participation, and recommendations from the Drug Safety Oversight Board (the list goes on). *Id.* § 355-1(h). And that same subsection instructs the Secretary to "act on the proposed" REMS within the time period prescribed. *Id.* § 355-1(h)(2)(A)(i). In sum, under the statute, it is clear that a REMS is both submitted and approved pursuant to Section 355-1. The fact the REMS is part of the broader "application" submitted under Section 355(b) is irrelevant because the REMS is not a proposed "use" for which an applicant "seek[s] approval" under that subsection. Indeed, Section 355-1 itself recognizes that, while a proposed REMS is part of a broader "application," it is submitted under Section 355-1. *Id.* § 355-1(a)(1), (h)(1), (h)(3).

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████.[19]

Separately, even if Avadel's REMS were subject to approval under subsection 355(b), it would make no difference, because *Avadel* in the LUMRYZ REMS is not "seeking approval" for a "use" for "such drug," sodium oxybate. 21 U.S.C. § 355(b)(2). This is just a statutory matching exercise: Is there a match between (i) a "use for such drug" described by U-1110 (discussed *supra* at 25-31), and (ii) a "use for such drug for which the applicant," Avadel, "is seeking approval." 21 U.S.C. § 355(b)(2)(A). The Federal Defendants raise this issue expressly: "The question is whether the 'use' described in U-1110 . . . is – in addition to being part of Jazz's REMS – a use

---

[19] Jazz argues (at 28) "REMS elements" are "approved pursuant to section 505(c) and (d)." But if that were right, it would just confirm that Avadel wins, because, as the Federal Defendants note (at 18), the applicant must seek approval of the relevant "use" under § 355(b), not § 355(c) or (d).

for which Avadel seeks approval under section 355(b)."  Fed. Defs.' Br. at 18; *see also id.* at 20.

This issue is readily disposed of:  For the same reasons discussed above (*supra* at 25-31) *Avadel's* "use" for which it is purportedly "seeking approval," the LUMRYZ REMS, is not a "use for such drug," 21 U.S.C. § 355(b)(2), nor a "condition of use" "for which the applicant is seeking approval." 21 C.F.R. § 314.50(i)(1)(iii)(B). This all might seem a bit redundant, and it is.  But Jazz's arguments (at 26-32) make it necessary to highlight the issue:  Even if Jazz were right in its incorrect claim that this Court cannot review whether *U-1110* "claims a use for such drug" or a "condition or use," contrary to the binding *Purepac* decision, there is no dispute this Court *would* in all events have jurisdiction over this distinct issue of whether *Avadel* in the LUMRYZ REMS is "seeking approval under this subsection" for a "use" for "such drug."  21 U.S.C. § 355(b)(2)(A). Avadel's LUMRYZ REMS does nothing of the sort.  *See supra* at 25-31; ████████████

## C.  FDA Violated Its Own Regulations by Referring To LUMRYZ REMS Information beyond the LUMRYZ Labeling

FDA has bound itself by regulation to look only to a NDA's proposed "labeling" to determine the use for which an NDA seeks approval, and thus, whether a certification is required. 21 C.F.R. § 314.50(i)(1)(iii)(B).  FDA failed to comply with its regulation, because it based its Patent Decision on a "LUMRYZ REMS Document" that is not part of the LUMRYZ labeling.

The Federal Defendants (at 20) and Jazz (at 33-34, 38) argue that Avadel waived this challenge by failing to raise it, and by suggesting in places that a REMS might sometimes form part of labeling.  As with their prior waiver arguments, these arguments overstate traditional waiver doctrines.  *See supra* at 16-17.  "[E]xhaustion is 'a rule of judicial administration,'" and "where Congress has not clearly required exhaustion, sound judicial discretion governs."  *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992), *superseded on other grounds*, *Woodford v. Ngo*, 548 U.S. 81 (2006); *cf. Jason v. Summerfield*, 214 F.2d 273, 276 (D.C. Cir. 1954) ("equitable estoppel do[es]

not ordinarily apply" to "administrative" decisions). Here, judicial discretion does not militate in favor of permitting FDA to violate its own regulations. *Nat'l Env't Dev. Ass'n v*, 752 F.3d at 1009.

The LUMRYZ labeling—as opposed to the "LUMRYZ REMS Document" FDA considered—makes no reference to a database, and therefore cannot overlap with U-1110. As Avadel has explained (Mot. at 32), the FDCA provides two separate pathways for approval of an NDA's "labeling" and a proposed "REMS." *Compare* 21 U.S.C. § 355(b)(1)(A)(vi), (c)-(d) (labeling review), *with* 21 U.S.C. § 355-1(a)(1), (h) (REMS review). Here, it is undisputed, as Avadel has shown, that the "LUMRYZ REMS Document" will neither be included in the LUMRYZ label or upon the drug or its container or wrappers, or accompanying the drug. Divis Decl. ¶ 32. It is therefore not part of the labeling. *See* 21 U.S.C. § 321(m).

Instead, a REMS "is a risk management plan that uses risk minimization strategies *beyond approved labeling* to manage serious risks associated with a drug."[20] Courts have concurred with FDA's view that a REMS "allows for additional FDA restrictions beyond those set forth on the drug's labeling." *Am. Coll. of Obstetricians & Gynecologists v. FDA*, 472 F. Supp. 3d 183, 190 (D. Md. 2020). The Federal Defendants' (at 20-21) and Jazz's (at 34-35) citation to *Kordel v. United States* is not to the contrary. 335 U.S. 345, 350 (1948). That case concerned pamphlets that were mailed to consumers separate from the drug itself. *Id.* The Supreme Court concluded that "labeling" is not limited to "labels that are on or in the article," but also content that "supplements or explains" the drug as part of "an integrated distribution program" to consumers. *Id.* at 349-50.

██████████████████████████████████████████████

██████████████████████████████████████████████

---

[20] Dkt. 2-33, Ex. 27 to Divis Decl., Questions and Answers: FDA Approves a Class Risk Evaluation and Mitigation Strategy (REMS) for Transmucosal Immediate-Release Fentanyl (TIRF) Medicines ("Q&A"), FDA (Dec. 28, 2020) (emphasis added).

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████   This document was put

on file with FDA; is not addressed to patients or prescribers; and, at most, may be docketed by

FDA onto its website.  *See* Fed. Defs.' Br. at 21; Jazz Br. at 34-35; Divis Decl. ¶ 32.  But merely

posting to an agency website is not sufficient to amount to "labeling."  *See, e.g.*, *Wilson v. Frito-*

*Lay N. Am., Inc.*, No. 12-1586 SC, 2013 WL 1320468, at *7 (N.D. Cal. Apr. 1, 2013) (website did

not constitute "labeling").   Jazz's main argument (at 34-35) is that Avadel would eventually

disseminate *other* letters, brochures, and other educational materials (most of which do not

mention a "database") for patients, prescribers, and pharmacists.  But Jazz does not contend those

individuals would receive the LUMRYZ REMS Document, the only document FDA relied on.[21]

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████   Jazz argues (at

36-37) that "labeling" is broader than "prescribing information;" but Jazz does not demonstrate

the LUMRYZ REMS Document is "labeling."   Absent any overlap between the proposed

LUMRYZ labeling and U-1110's description of the '963 patent, no certification was required

under 21 C.F.R. § 314.50(i)(1)(iii)(B), and the Patent Decision erred in concluding otherwise.

### D.    U-1110 Does Not Describe a Use Of Sodium Oxybate For Which Avadel Seeks Approval in the LUMRYZ NDA.

Even if the "LUMRYZ REMS Document" did form part of LUMRYZ's "labeling," there

is no overlap between that document and U-1110's description of the '963 patent. ████████████

---

[21] Jazz also argues (at 32) that, under Section 355(b), FDA must disregard its regulations, and review any portion of the LUMRYZ NDA, including the REMS, as a "use" for which Avadel seeks approval.  But this is the same error Jazz made earlier:  A REMS is not a "use" for which an applicant seeks "approval under this subsection," *i.e.*, subsection 355(b).  *Supra* at 33-34.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

Of course, there is nothing novel or special about using a "database"—it is as common today as using a file cabinet once was.  The question is not whether Jazz and Avadel use some system of maintaining records, it is how that system works.  And these two systems clearly work differently.

The Federal Defendants (at 21-24) and Jazz (at 38-39) argue that the term "a" can have multiple meanings—sometimes, to refer to a singular object, and sometimes, one or more objects. But Federal Defendants and Jazz are missing the key point: ████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████  That accords with the plain-text meaning of "a."  *See*

38



*Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1480 (2021). Pursuant to FDA's binding regulations and *Purepac*, FDA is not permitted to give effect to a use code's scope if it exceeds the *approved use* (even if that use is allegedly patented).[22] ███████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████ Jazz's own arguments (at 30) confirm FDA's decision was correct: Jazz invites the Court to review the "'963 patent" in the "record" to determine what uses are covered by U-1110, and the '963 patent claims the use of *one* "central database," "a single computer database," *i.e.*, "a central pharmacy and database to track all prescriptions." Dkt. 2-13, Ex. 7 to Divis Decl., '963 patent at 22, col. 1 line 48–50; *id.* at 28, col. 8 line 42–43.[23]

████████████████████████████████████████████████████

████████████████████████████████████████ But FDA's "artificial interpretation" of the U-1110 code improperly imputed ambiguity into a "use code" it had definitively construed pages earlier. *Purepac*, 238 F. Supp. 2d at 209. "To make matters worse . . . the agency then chose to resolve" the question "illogically, by favoring an unstated and ambiguous implication over a stated

---

[22] A "use code" *both* (i) must be within the scope of the patent, *and also*, (ii) must "claim an approved use" of a drug. 68 Fed. Reg. at 36,682-83. While FDA defers to the incumbent as to the first issue, FDA independently "assess[es]" the latter issue, of the *approved* use that is permissibly covered by the use code. *Id.* To carry out this review of what is the "approved" use covered by the incumbent "use code," FDA relies on the NDA holder to "submit more specific information on the approved methods of use protected by a submitted patent," *id.*, ████████████ ██████████████████████████████████ ████████ *see also* 21 C.F.R. § 314.53(b)(1), (c)(2)(i)(O)(2), (ii)(P)(2), (d)(4).

[23] Accordingly, the Federal Defendants' and Jazz's authorities are inapposite, because they acknowledge that where the surrounding context shows a singular object, "a," as in "a database" refers to "only one." *See, e.g.*, *Island Intell. Prop., LLC v. TD Ameritrade, Inc.*, No. 21-273, 2022 WL 1608044, at *8 (E.D. Tex. May 20, 2022) (interpretation of singular or plural depends on context, without opining on a "single" "Central" database patent like the '963 patent).

and definite declaration," *id.*, *i.e.* ████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████ "the FDA may not,

consistent with the requirement of reasoned decision-making, impose a requirement on [an

applicant] wholly incompatible with the agency's own understanding of the facts." *Purepac*, 238

F. Supp. 2d at 210 (agency cannot simply "retreat[] from its previous position" on use-code scope).

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████[24] U-1110, as construed by FDA, does not claim the use of multiple databases for drug

distribution as described in the LUMRYZ REMS Document.

## II. DEFENDANTS SHOULD BE ORDERED TO FULLY ADJUDICATE THE LUMRYZ NDA WITHIN FOURTEEN DAYS OF THIS COURT'S ORDER

With respect to Avadel's claim that the Court should "compel agency action unlawfully

---

[24] The Federal Defendants (at 23) and Jazz (at 25) argue that since other ANDA (generic) applicants certified to U-1110, Avadel should have done so. But the ANDA applicants are differently situated: Avadel ensured that its REMS database design would not tread on U-1110, by, *inter alia*, adopting a unique design with four databases, rather than joining the ANDA generics' REMS program as to which they had certified. ███████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

withheld," 5 U.S.C. § 706(1), the Federal Defendants' arguments (at 24-26) and Jazz's arguments (at 40-43) are all fundamentally misdirected.  They contend that Federal Defendants should *not* be compelled to finally adjudicate the LUMRYZ NDA within 14 days of this Court's order, because a patent certification bars approval.  But that is not the relief Avadel is requesting:  Avadel is requesting that, to the extent Avadel is no longer bound to a certification—*i.e.*, FDA's Patent Decision is set aside—FDA should not be permitted to keep LUMRYZ's NDA in endless limbo, in continuing violation of the 180-day deadline for a decision of the NDA.  Avadel Mot. at 41-45.

The Federal Defendants' (at 7 n.7) and Jazz's (at 14, 16, 41) arguments reinforce why this relief is necessary.  They claim that there is an "unresolved" question of "whether any orphan drug exclusivity (ODE) recognized for Xyrem . . . affects the approval of Avadel's NDA."  But if Federal Defendants and Jazz are right that FDA is holding in reserve an unresolved issue, the time has come to decide that issue, and either approve the NDA, or offer Avadel a hearing on approvability.  *See* 21 U.S.C. § 355(c)(1); 21 U.S.C. § 360cc(a)(2).  Against the background of FDA's months of unlawful inaction on the NDA, FDA cannot now take a "take our word for it" approach that they will act promptly now.[25]  Jazz also suggests (at 42) that a PDUFA action date is just an aspirational goal that can negate the mandatory statutory deadline for agency action, but this Court has already expressly rejected that exact argument.  *Sandoz*, 427 F. Supp. 2d at 34-36.

Finally, the Federal Defendants (at 26) raise no argument that the "*TRAC* factors"

---

[25] Jazz further muddles the issue (at 40) by arguing that an NDA subject to a certification is only subject to the timing provisions in Section 505(c)(3), not the mandatory 180-day deadline in Section 505(c)(1).  Not so.  These provisions work together:  The former provision requires FDA to "*approve* the application" or offer a "hearing" within 180 "days after the filing of an application," 21 U.S.C. § 355(c)(1), while the latter provision provides the time at which the "approval of an application . . . shall be made *effective*," based on the relevant patent certification. 21 U.S.C. § 355(c)(3).  These provisions allow FDA to delay the effectiveness of an approval based on a certification, not to endlessly defer adjudicating the approval of the NDA.

potentially relevant to an unreasonable *delay* action (not Avadel's challenge to action unlawfully withheld[26]) are unmet, while Jazz argues those factors are not met.  Jazz is wrong:  Jazz makes no showing that anything about the Covid-19 pandemic has prevented FDA from timely adjudicating other NDAs, and Avadel has shown the contrary.  Mot. at 43-44.  Jazz identifies (at 42) the interests of "patients" in new "treatment options" as "narrow."  But those interests are serious and weighty, as are the interests in ensuring that the Federal Defendants comply with the law.  *Id.* at 41.

## III.    ALL EQUITABLE FACTORS SUPPORT IMMEDIATE RELIEF

The Federal Defendants (at 27-28) and Jazz (at 43-45) offer only a cursory discussion of the equitable factors governing preliminary injunctive relief, and do not submit any evidence to dispute Avadel's showings.  That makes sense:  Given that the Court now has before it cross-motions for summary judgment, it technically need not reach those issues.  Dkt. 12 at 2-3.  Because Avadel has requested expedited relief, however, it briefly responds to their arguments here.

### A.    Avadel Will Suffer Irreparable Harm Absent Immediate Relief

The Federal Defendants (at 27) and Jazz (at 43) argue that the prospect of immediate irreparable harm amounts to "speculation."  ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[26] The Federal Defendants argue (at 26 n.15) that agency action unlawfully withheld would not, in of itself, justify an injunction compelling agency action.  Putting aside that Avadel *has* shown its entitlement to an injunction, *infra* at 42-45, the cases the Federal Defendants cite (*Cobell* and *Barr*) are inapposite because they discussed claims framed as unreasonably *delayed* action.  Here, Avadel is expressly arguing that FDA has unlawfully *withheld* action required by a statutory deadline.



*Bell Helicopter Textron, Inc. v. Airbus Helicopters*, 78 F. Supp. 3d 253, 274 (D.D.C. 2015). They do not dispute that the window of time for this Court to provide meaningful relief is extremely short, favoring immediate relief. Divis Decl. ¶¶ 73-74. Nor do the Federal Defendants dispute the harm to narcolepsy patients nationwide is irreparable,

depriving patients of a superior alternative to twice-nightly oxybates.  Corser Decl. ¶¶ 20-25, 35;

Divis Decl. ¶ 72; *Int'l Long Term Care, Inc. v. Shalala*, 947 F. Supp. 15, 18 (D.D.C. 1996).

Finally, Jazz's "blame Avadel" theory of irreparable harm (at 44), that Avadel adopted an

"ill-considered regulatory strategy," is unavailing.  Avadel appropriately expected FDA to follow

the law, by rendering a final decision on its NDA by October 15, 2021; not that FDA would hold

Avadel in limbo for over seven months, then issue an unlawful Patent Decision further delaying

final approval until June 2023.  Avadel Mot. at 41-44.  Jazz also hypothesizes (at 44) that other

future events might deprive Avadel of final approval. ██████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

████████████████████████████████████ Jazz argues (at 44) that its Orphan Drug Exclusivity

("ODE") *might* block approval of the LUMRYZ REMS until 2027, but FDA has never provided

any hint that will occur.  No wonder:  ODE cannot bar new entrants if the new entrant's drug is

"clinically superior" to an approved drug.  21 U.S.C. § 360cc(a), (c)(1).  Avadel has already made

that showing to FDA.[27]  As things stand, FDA has identified no obstacle to immediate, final

approval, apart from its Patent Decision and resulting compelled patent certification.  Jazz's

speculation is inadequate to dispute irreparable harm.  *See Filazapovich v. Dep't of State*, 560 F.

Supp. 3d 203, 244 (D.D.C. 2021) (Mehta, J.) (movant need not show they are "guaranteed" to have

an application approved, but rather, that they are entitled to have it "adjudicated").

---

[27] Among the many reasons that LUMRYZ is clinically superior to Xyrem and Xywav, LUMRYZ
is taken once before going to bed, unlike Jazz's twice-nightly formulations that require patients to
set an alarm to forcefully awaken in the middle of the night.  Avadel Mot. at 10-11; ██████████
███████████████████████████████████████████████████████████████████████████████

### B.     The Balance Of Equities And Public Interest Favor Immediate Relief

Next, the balance of equities and public interest, which merge "when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), also support preliminary relief.

The Federal Defendants' appeal (at 28) that the Court should not "upend the status quo" is unavailing:  Where an agency is engaged in an ongoing violation of the law, much less one perpetuating a monopoly, the public interest clearly favors immediately ending the "perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 6, 13 (D.C. Cir. 2016); *see also Otsuka Pharm. Co., Ltd. v. Torrent Pharm. Ltd., Inc*., 99 F. Supp. 3d 461, 507 (D.N.J. 2015).  Remarkably, the Federal Defendants claim (at 27-28) that overturning the Patent Decision would cause "certain and substantial hardship" and "irreparable harm" *to Jazz*.  But Jazz itself has not even asserted any such harm; it did not even submit a harm declaration.  Instead, the Federal Defendants' reflexive defense of Jazz's commercial interests has more to say about FDA's own interests, than any public interest.  Nor do the Federal Defendants dispute the substantial medical benefits of LUMRYZ to patients.  *See* Avadel Mot. at 10-11; *supra* at 44 & n.27.

## CONCLUSION

For the foregoing reasons, this Court should grant Avadel's motion; deny the Federal Defendants' and Jazz's cross motions; set aside FDA's Patent Decision ordering Avadel to submit a patent certification; and order FDA to decide the LUMRYZ NDA within 14 days of the Court's order.

Respectfully submitted,

Dated:  September 2, 2022                    /s Philip J. Perry_____
                                            Philip J. Perry (DC Bar No. 434278)
                                            Andrew D. Prins (DC Bar No. 998490)
                                            John R. Manthei (DC Bar No. 447123)
                                            Nicholas L. Schlossman (DC Bar No. 1029362)

                                            LATHAM & WATKINS LLP
                                            555 Eleventh Street NW, Suite 1000
                                            Washington, DC 20004
                                            Tel: (202) 637-2200
                                            Fax: (202) 637-2201
                                            Email: philip.perry@lw.com
                                            andrew.prins@lw.com
                                            john.manthei@lw.com
                                            nicholas.schlossman@lw.com

                                            *Attorneys for Plaintiff*